IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| EJS Investment Holdings, LLC<br><br>                     Plaintiff,<br><br>v.<br><br>David R. Jones, Elizabeth Carol Freeman,<br>Jackson Walker, LLP, Kirkland & Ellis, LLP,<br>and Kirkland & Ellis International, LLP, Brown<br>Rudnick, LLP<br><br>                     Defendants, | Civil Action File<br>No. _____<br><br><br><br>Jury Trial Demanded<br><br><br>To the Honorable Alia Moses,<br>Chief United States District<br>Judge: |

**PLAINTIFF'S ORIGINAL COMPLAINT; ALTERNATIVE CLASS ACTION
COMPLAINT**

# TABLE OF CONTENTS

Introduction ........................................................................................................ 1

Parties ................................................................................................................ 9

Jurisdiction and Venue ...................................................................................... 10

Factual Allegations ............................................................................................ 12

I.      Jones ordains himself the nation's leading mega-bankruptcy judge. ...................... 12

II.     Jones and his clerk, Freeman, start an intimate relationship and live together in a jointly owned home. ........................................................................ 13

III.    Freeman joins Jackson Walker and its bankruptcy practice before Jones skyrockets…. ................................................................................................ 14

IV.     Kirkland's mass filings in the Southern District coincide with Freeman's arrival at Jackson Walker, which Kirkland uses almost exclusively as "local counsel." ......... 16

V.      Kirkland, Jackson Walker, and Freeman collect millions of dollars in cases before Jones without disclosing the intimate relationship. ................................. 17

VI.     Jackson Walker claims it learned of the relationship in March 2021, discloses it to Kirkland, and both continue hiding the relationship. ............................. 18

VII.    Communications among Jackson Walker attorneys indicate knowledge of the relationship and a cover up. ................................................................ 22

VIII.   Freeman remains at Jackson Walker after March 2021, still living with and in an intimate relationship with Jones, while Jackson Walker and Kirkland continue hiding it. ................................................................................... 25

IX.     Jackson Walker admits it knew of the ongoing nature of the Jones-Freeman relationship by March 2022; yet the parties continue to hide it and profit. .............. 26

X.      Chesapeake files for bankruptcy. ......................................................... 29

XI.     Freeman, Jackson Walker, and Kirkland advocate for an unlawful plan that gives a windfall to senior institutional creditors at the expense of junior creditors. ............. 31

XII.    Kirkland, Jackson Walker and Brown Rudnick, all with knowledge of the relationship,  move for and are awarded fees by Jones without disclosure. ............. 36

XIII.   Jones confirms the unlawful plan that awards a 200+% recovery to Class 4 at a cost of nearly $2 billion to Classes 5 and 6. .................................................................. 38

XIV.   Jones finally admits to the intimate relationship with Freeman............................. 39

XV.   Judge Jones resigns after the Fifth Circuit finds "probable cause to believe [he] engaged in misconduct[.]" ...................................................................................... 40

XVI.   The U.S. Trustee files a Rule 60(b) motion. ......................................................... 41

XVII.   Defendants failed to satisfy their obligations to disclose the Jones-Freeman relationship and disqualify Judge ........................................................................... 41

Standing and Motion for Derivative Standing ...................................................................... 42

Class Action Allegations ..................................................................................................... 45

Claims for Relief ................................................................................................................. 49

Count I:  Violation of Title 18 U.S.C. § 1962(c) (against Jones, Freeman, Kirkland, and Jackson Walker) ................................................................................................................. 49

Count II: Violation of Title 18 U.S.C. § 1962(d) (against Jones, Freeman, Kirkland, and Jackson Walker) ................................................................................................................. 68

Count III: Common Law Fraud (against Jones, Freeman, Kirkland, and Jackson Walker) 70

Count IV: Breach of Fiduciary Duty (against all Defendants) ............................................. 72

Count V: Aiding and Abetting Breach of Fiduciary Duty (against all Defendants) ............. 80

Count VI: Common-Law Civil Conspiracy (against Jones, Freeman, Kirkland, and Jackson Walker) ................................................................................................................. 82

Count VII: Unjust Enrichment (against all Deefendants) .................................................... 84

Respondeat Superior and/or Agency Liability .................................................................... 85

Prayer For Relief ................................................................................................................. 86

Demand for Jury Trial ......................................................................................................... 87

Comes now Plaintiff, EJS Investment Holdings, LLC, by and through counsel, on its own behalf and on behalf of all others similarly situated, and brings this Complaint, or alternatively, Class Action Complaint against the above-named Defendants, upon information and belief including the investigation of counsel, against the above-named Defendants, David R. Jones, Elizabeth Carol Freeman, Jackson Walker, LLP, Kirkland & Ellis, LLP, and Kirkland & Ellis International, LLP, and Brown Rudnick, LLP, (collectively, "Defendants"), and respectfully states:

## **INTRODUCTION**

1.      This lawsuit seeks redress for victims of mass corruption in the Houston Bankruptcy Court. As described to this Court previously, David R. Jones, the now resigned U.S. Chief Bankruptcy Judge, plotted with his live-in girlfriend and former clerk Elizabeth Freeman, her former law firm, Jackson Walker, and lead counsel in most cases Kirkland (hereinafter "RICO Defendants"), to prey upon distressed entities for their own considerable financial and reputational benefit. They leveraged the secret relationship between judge and key restructuring partner to obtain employment opportunities, collect large fees, and control mega-bankruptcy outcomes, while evading the scrutiny that would have come with notice of the disqualifying conflict.

2.      Never once across more than thirty mega-bankruptcies did they disclose the relationship even though the law demanded it. Why? Because doing so would have meant disqualification in *all* cases—costing millions in professional fees and tarnishing reputations.

3.     In this case, the consortium targeted Chesapeake Energy Corporation,[1] a petroleum company formed in 1989. Chesapeake management hired Kirkland in March 2020 to investigate the possibility of filing Chapter 11 after financial struggles with falling petroleum prices during the Covid-19 pandemic. Kirkland secured a $12.5 million retainer for its pre-petition work. Even though Chesapeake was an Oklahoma-based corporation, it filed bankruptcy in the Southern District of Texas, Houston Division on June 28, 2020. Of note, around this same time frame—mid-to-late 2020—Kirkland restructuring partner, Ryan Bennett, advised another out-of-state corporation (Bouchard Transportation) to file in Houston because they had access to a "friendly" judge.

4.     The *Chesapeake* bankruptcy demonstrates what happened when corporate management, induced by lucrative payouts, acquiesced to the consortium's plans. In other cases like *Bouchard* and *GWG*, Jones and his co-conspirators forced out management when they protested fees or the direction of the bankruptcy. The consortium then lodged malicious adversary proceedings against executives as part of an overall smear campaign.

5.     That did not happen in the *Chesapeake* bankruptcy because management was induced by $25 million in bonuses—paid on the eve of filing bankruptcy—to go along with the scheme.[2] This enabled Freeman, Jackson Walker, and Kirkland to generate exorbitant professional fees (with $35 million-plus to Kirkland and around $900,000 to Jackson Walker)

---

[1] *In re Chesapeake Energy Corporation*, No. 20-33233, ECF No. 1 (S.D. Tex.) (Voluntary Petition for Non-Individuals Filing for Bankruptcy).

[2] According to a Form 8-K filing signed on May 5, 2020, 21 executives would be prepaid $25 million. Form 8-K, Chesapeake Energy Corporation, dated May 5, 2020, filed May 8, 2020 available at https://www.sec.gov/ix?doc=/Archives/edgar/data/895126/000089512620000112/a8-k2020x05x088xkreret.htm (last visited Jan. 9, 2026).

while benefitting corporate and institutional creditors and hedge funds (regular players in the bankruptcy world) at the expense of junior creditors and shareholders. The consortium crammed down a plan that deliberately undervalued the company's financial standing by at least $2 billion and used the plan to leverage out retail, non-institutional creditors like Plaintiff, which held more than $150 million in Chesapeake bonds.[3] In fact, Jones himself remarked on the record that he calculated the value of the company at $5.1 billion rather than the $3.25 billion relied on by the plan.[4] Nevertheless, the plan—by design—was never adjusted to account for the reality.

6.        The consortium reallocated hundreds of millions of dollars that the plan pretended did not exist to key executives and institutional investors and creditors. Jones and his cohorts also implemented a plan far outside the ordinary bankruptcy scheme, which as a corollary to the absolute priority rule, generally requires that no creditor take more than 100% until all creditors have been made whole. *See e.g., In re Breitburn Energy Partners LP*, 582 B.R. 321, 350 (Bankr. S.D.N.Y. Mar. 9, 2018) ("An unwritten corollary to the absolute priority rule is that a senior class cannot receive more than full compensation for its claims") (citations omitted); *In re Idearc, Inc.*, 423 B.R. 138, 170 (N.D. Tex. Dec. 22, 2009) ("The corollary of the absolute priority rule is that senior classes cannot receive more than a one hundred percent (100%)

---

[3] The plan is premised on a $3.25 billion total enterprise value. *Chesapeake*, No. 20-33233, ECF No. 2915 at PDF pp. 154, 159, 166. However, Jones made a determination that the company was worth $5.129 billion. *Id.* ECF No. 2815 at 333–36. Other bankruptcy participants had valuations even higher. Nevertheless, the plan was not adjusted to reflect the change in value.

[4] *Id.* ECF No. 2815 at 334–36.

recovery for their claims") (citations omitted).[5] They orchestrated an extraordinary 200+% windfall recovery to senior, institutional creditors whom they worked with frequently. Meanwhile, they provided between 4% and 25% recovery for junior creditors like Plaintiff. The consortium's confirmation order does not even attempt to explain this egregious and unlawful disparity. In terms of dollars, Jones and his cohorts took nearly $2 billion that should have gone to the junior creditors and distributed it among their favored repeat players.

7.     Plaintiff, EJS Investment Holdings, is a privately held investment company that owned over $150 million in Chesapeake bonds. When EJS learned of the outrageous plan proposed by Kirkland, Jackson Walker, and Freeman, it raised timely objections to the improprieties in the plan but—as in other cases—were railroaded by Jones. Plaintiff even proposed an alternative plan that would have allowed a full 100% recovery to senior, institutional creditors, while returning over 50% to junior classes of creditors. Plaintiff presented that plan to counsel for the Official Committee of Unsecured Creditors ("Creditors' Committee"), Robert Stark with Brown Rudnick, who knew of the Jones-Freeman relationship but did not disclose it. Stark initially advised that if Plaintiff could get the plan funded, he would advocate it before Jones.

---

[5] Because the plan unfairly discriminated against Class 6, which did not accept the plan, it also violated 28 U.S.C. § 1129. Jones' confirmation order (entered despite his mandatory disqualification) indicates otherwise but provides no explanation for the 200+% recovery for Class 4 relative to 4% for Class 6. *Chesapeake*, No. 20-33233, ECF No. 2915 at 27, 29. And while Class 5 accepted the plan, it was only through coercion. Class 5 was offered the opportunity to participate in a very lucrative Rights Offering for new post-confirmation equity interests but could only participate if they voted for the plan. *Id.* ECF No. 210 ¶ 114 (citing Supplemental Disclosure to Second Lien Notes, ECF No. 1930, pp. 1–2). Of course, no class was informed ahead of the vote that the judge approving the plan and counsel for debtor-in-possession were in an intimate relationship or that the firms, judge, and key restructuring partner were conspiring to keep the relationship hidden.

8.      Plaintiff did just that—proposing a plan secured by $750 million in financing. Despite Stark's representations, however, he inexplicably refused to advocate for the plan. According to Stark, defying Jones would have been disastrous.

9.      Predictably, when Plaintiff presented its plan (without Stark's support), Jones rejected it out of hand. Plaintiff's plan, which would have eliminated the windfall to senior creditors, realized the increased value of the company, and provided greater recovery to junior creditors, was cast aside in favor of the consortium's plan that unlawfully rewarded the institutional creditors with whom they engaged regularly. This favoritism, along with $25 million in executive bonuses, allowed the consortium to collect tens of millions of dollars in professional fees unopposed from the most influential and well-funded creditors. Besides rewarding repeat players and ensuring red carpet treatment on professional fees from them, it is easy to imagine what additional motivators or interests were in play. To be sure, no judge without ulterior motives would have approved the plan that Jones did.

10.     The consortium fool-proofed their scheme with sweeping, self-serving releases and exculpation provisions in the bankruptcy plan.[6] Additionally, their confirmation order was appeal-proofed because under Bankruptcy Rule 8007, Jones would have required a billion-dollar-plus bond to cover the anticipated benefits the confirmed plan provided to creditors superior to Plaintiff.[7] In light of this impossible bond and Stark's warning about Jones, there

---

[6] *Id.* ECF No. 2915 at 16-21.

[7] *See generally* Eleanor H. Gilbane, *Investing in an Appeal, The Dilemma Facing an Appellant of Confirmation Orders*, American Bankruptcy Institute Journal Vol. XXXII, No. 4 (May 2013). , also accessible at https://restructuring.weil.com/wp-content/uploads/2013/05/feature-5-13-gilbane.pdf (noting that "the judge has full discretion regarding the amount of the bond" to stay a confirmation order, which must be sufficient to protect the estate and its constituents against the risk of harm posed by the estate, and "the amount may be

was no viable path for an appeal, particularly when Plaintiff was unaware of the source of the collusion—i.e., the Jones-Freeman relationship.

11.     Critical to RICO Defendants' scheme, each member of the consortium knew about the Jones-Freeman relationship but kept it hidden from those interested in the bankruptcy. Jackson Walker admits it knew of the relationship in some form by March 2021. But even that admission is disingenuous. Other lawyers at the firm knew long before. In fact, Jackson Walker set about—and subsequently contractually bound itself—to affirmatively cover-up the relationship. Of course, since Freeman was a partner at the firm, parsing dates is unnecessary. Jackson Walker is charged with knowledge from the moment Freeman became partner in 2018.

12.     And as it turns out, Stark admitted to EJS representative Joe Sofio in October 2023 that he had known of the Jones-Freeman relationship all along. As a partner, Stark's knowledge is imputed to Brown Rudnick. Despite knowledge of this concealed relationship and the patent conflicts it created, Brown Rudnick, on behalf of the Creditors' Committee, never disclosed the relationship or challenged Jones', Freeman's, Jackson Walker's, or Kirkland's participation in the bankruptcy.

13.     For its part, Kirkland has suggested the absence of evidence of its knowledge, without an outright denial of knowledge by its partners. In fact, Kirkland partners did know. Stark admitted that Kirkland knew of the relationship all along, which is hardly surprising considering the firm only began filing in mass with Jackson Walker as local counsel after

---

virtually unreviewable by a court of appeals"); *see also In re Tribune Co.*, 477 B.R. 465, 482 (Bankr. D. Del. 2012) (requiring $1.5 billion bond to stay confirmation order)*; In re Adelphia Communs. Corp.*, 361 B.R. 337, 368 (S.D.N.Y. Jan. 24, 2007) (requiring $1.3 billion bond to stay confirmation order).

Freeman joined the firm. Additionally, Jackson Walker admits it disclosed the relationship to Kirkland in some form in early March 2021.

14.    Had any one of these actors disclosed, Jones would have been disqualified, Jackson Walker and Freeman could not be retained under 11 U.S.C. § 327, both firms and Freeman would have been subject to removal for breaching fiduciary duties, all players would be exposed to liability across dozens of bankruptcies, and of course, the bankruptcy plan would not have gone through as orchestrated.

15.    In carrying out their plot, Freeman, Jackson Walker, and Kirkland filed or caused to be filed numerous misleading and dishonest federal court papers without disclosing the Jones-Freeman relationship, amounting to bankruptcy fraud, honest services fraud, mail and wire fraud, and obstruction of justice—actionable under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Further, Jackson Walker, Kirkland, Freeman, and Jones breached their fiduciary duties to the bondholders and other interested parties in the bankruptcies, committed fraud, engaged in a civil conspiracy, and were unjustly enriched. Meanwhile, Brown Rudnick breached its fiduciary duties to the bondholders and other interested parties in the bankruptcies, committed fraud, and was unjustly enriched.

16.    As a result of the foregoing conduct of all Defendants, and as detailed more fully below, Plaintiff has sustained significant damages. Plaintiff held second lien bonds (Class 5)[8] with a face value of $5 million and unsecured bonds (Class 6) with a face value of more than

---

[8] Under the plant, Class 4 includes "FLLO Term Loan Facility Claims;" Class 5 includes "Second Lien Notes Claims;" Class 6 includes "Unsecured Notes Claims;" and Class 7 includes "General Unsecured Claims." *Chesapeake,* ECF No. 2915 at PDF p. 172, p. 21 of the plan.

$149 million.[9] As a result of the unlawful plan orchestrated and approved by the consortium, Plaintiff's more junior Class 5 and Class 6 claims were reduced to pennies on the dollar, while the Class 4 institutional creditors reaped a windfall 200+% recovery. Plaintiff and other Class 6 creditors were denied access to the new equity being issued under the confirmed plan. However, Plaintiff's proposed plan, which was fully vetted and backed by reputable commercial banks, would have doubled recovery for Classes 5 and 6 while still maintaining a 100% recovery for Class 4 and realizing nearly $2 billion to junior creditors. Plaintiff would have recovered at least $70 million for its approximate $155 million in bonds instead of only the $5.5 million it received under the confirmed plan. Thus, as a result of Defendants' misconduct, Plaintiff suffered at least $64 million in damages.

17.    With respect to Classes 5 and 6 as a whole, the loss was nearly $2 billion. While Class 4 would have received $1.5 billion less under Plaintiff's plan, they would have still received a full 100% recovery. The value that would have been realized under Plaintiff's plan was improperly and unjustifiably allocated to senior creditors, advocated, and confirmed by the consortium.

18.    Additionally, Jackson Walker was able to secure more than $900,000 in attorneys' fees and expenses awarded by Jones in the Chesapeake bankruptcy. This included Freeman billing for numerous hearings before Jones. Meanwhile, Kirkland unjustly collected more than $23 million in fees and expenses awarded by Jones in addition to the $12.5 million paid pre-petition as a retainer. They would not have been entitled to this compensation had they

---

[9] The breakdown and treatment of Classes is found in Article III of the Fifth Amended Joint Chapter 11 Plan of Reorganization. *Id.* ECF No. 2915, Ex. A at 21–25 (pdf pp. 172–176). For purposes of EJS, Class 5 is described as Second Lien Notes Claims and Class 6 is described as Unsecured Notes Claims. *Id.* at 23-34 (pdf pp. 174–75).

disclosed what they knew about the relationship involving their chosen local counsel and the judge, and they deprived the bankruptcy estate of these funds through deception.

## PARTIES

19.    Plaintiff EJS Investment Holdings, LLC, is a limited liability company formed and existing under the laws of the State of Florida with its principal place of business in Florida. Plaintiff held $149,430,000 in unsecured bonds and $5,000,000 in second lien bonds issued by Chesapeake.

20.    Defendant David R. Jones is a natural person. Jones is the former Chief Judge of the Bankruptcy Court for the Southern District of Texas. He can be served with process at ███████████████████████. Additionally, the United States government can be served by certified mail upon the civil process clerk at the U.S. Attorney's Office and by certified mail to the Attorney General of the United States in Washington D.C.

21.    Defendant Elizabeth Carol Freeman is a natural person, licensed Texas attorney, former partner at Jackson Walker, LLP, in Houston, Texas. Freeman is an individual and a citizen and resident of Harris County, Texas, and may be served with process at ███████████████████████.

22.    Defendant Jackson Walker, LLP is a limited liability partnership incorporated and existing under the laws of the State of Texas with its principal place of business at 2323 Ross Avenue, Suite 600, Dallas, Texas 75201. It may be served through any of its general partners, including C. Wade Cooper, at 2323 Ross Avenue, Suite 600, Dallas, Texas 75201.

23.    Defendant Kirkland & Ellis, LLP, is a limited liability partnership incorporated and existing under the laws of the State of Illinois with its principal place of business at 300 North

LaSalle, Chicago, Illinois 60654. It may be served through its registered agent, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

24.     Defendant Kirkland & Ellis International, LLP, is a limited liability partnership incorporated and existing under the laws of the State of Delaware with its principal place of business at 300 North LaSalle, Chicago, Illinois 60654. It may be served through its registered agent, National Registered Agents, Inc., at 1209 Orange Street, Wilmington, Delaware 19801.

25.     Defendant Brown Rudnick, LLP, is a limited liability partnership formed and existing under the laws of the State of Massachusetts, with its principal place of business at One Financial Center, Boston, Massachusetts, 02111. It may be served through its registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

26.     Upon information and belief, certain individuals or entities other than the listed Defendants may have been involved in the misconduct alleged herein.

## JURISDICTION AND VENUE

27.     This Court has original federal question jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff brings claims under RICO, which is a federal statute. 18 U.S.C. §§ 1961, *et seq.*

28.     The Court also has original jurisdiction over this Class Action under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"), because this is a class action in which: (1) there are more than one hundred (100) members in the proposed class; (2) various members of the proposed class are citizens of states different from where Defendants are citizens; and (3) the amount in controversy, exclusive of interest and costs, exceeds $5,000,000 in the aggregate.

29.     The Court also has subject matter jurisdiction pursuant to 18 U.S.C. § 1964(c), which provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court."

30.     Plaintiff seeks recovery for injuries to business or property caused by violations of RICO (18 U.S.C. §§ 1961, *et seq*.); he suffered "economic injur[ies]" that as described *infra*, are "concrete and particular and not speculative." *Soto v. Vanderbilt Mortg. & Fin., Inc.*, No. C-10-66, 2010 LEXIS 87951, at *43 (S.D. Tex. 2010).

31.     This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. §1367. Plaintiff's state law claims are so related to their claims under RICO (18 U.S.C. §§ 1961, *et seq*) that they form part of the same case or controversy.

32.     Venue is proper in this District under 18 U.S.C. 1965(a) because it is where Defendants Jones, Freeman, and Jackson Walker reside, are found, and transact their affairs.

33.     In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District. Venue is proper because all Defendants do business in this District and the causes of action arose, in substantial part, in this District.

34.     Venue is additionally proper in this District under 28 U.S.C. § 1391 because Jones and Freeman are residents of this District for venue purposes and conduct business in this District. Additionally, Jackson Walker, LLP, is a corporation organized under the laws of this State.

## FACTUAL ALLEGATIONS

### I.    Jones ordains himself the nation's leading mega-bankruptcy judge.

35.    After his appointment in 2015, Jones transformed the Houston Division Bankruptcy Court into *the* center for high-dollar complex Chapter 11 bankruptcies.[10] Jones signed a General Order in 2018 directing all complex Chapter 11 cases filed in the Southern District, across all divisions, to two judges—himself and Judge Marvin Isgur.[11] He also set up a "complex advisory" committee of bankruptcy attorneys, including the head of Kirkland & Ellis' bankruptcy practice, who is not admitted to practice in Texas.[12]

36.    "In the years after the creation of the complex case system, Houston quickly attracted large bankruptcies that previously might have landed in Delaware or New York."[13] Thanks to Jones' efforts, "Houston went from being a bankruptcy backwater to becoming the single most popular destination for large, public company bankruptcy filings."[14] Just in 2023, for example, "of the 54 large Chapter 11 cases filed, twenty-five landed in SDTX, where only two judges, including Jones, oversaw large restructurings. This near majority was more than those total bankruptcy filings in the traditional stalwarts, Delaware and New York, combined."[15]

---

[10] Sujeet Indap, The downfall of the judge who dominated bankruptcy in America, THE FINANCIAL TIMES (Nov. 21, 2023), accessible at https://www.ft.com/content/574f0940-d82e-4e4a-98bd-271058cce434 (last visited Jan. 9, 2026); *see also* Adam J. Levitin, Judge Shopping in Chapter 11 Bankruptcy, 323 ILL. L. REV. 351, 372 (2013).

[11] *See* General Order 2018-1 (Jan. 29, 2018).

[12] *See* General Order 2018-6, (Bankr. S.D. Tex. June 29, 2018) (listing James Sprayregen on the committee).

[13] Indap, *supra* note 10.

[14] Levitin, *supra* note 10 at 374.

[15] Indap, *supra* note 10.

37.    Jones executed his plan with the "guaranty of case assignment to one of two judges who want to attract mega-cases and understand the need to 'sell' the venue to debtors."[16]

## II.    Jones and his clerk, Freeman, start an intimate relationship and live together in a jointly owned home.

38.    After working together at Porter Hedges, Freeman clerked for Jones in the bankruptcy court for the Southern District of Texas for six years— between 2011 and 2018. By at least 2011 (and probably earlier), the pair started a romantic relationship.

39.    Perhaps as early 2013 or 2014,[17] but at least by 2017, the two were living together and remained living together continuously.[18] On June 26, 2017, they executed a survivorship agreement as co-owners of a million dollar-plus home in Houston.[19] Freeman paid property taxes on the shared home.[20]

40.    Jones purchased another million-dollar home in Coldspring, Texas, on September 1, 2016.[21] On information and belief, Freeman had been living in that house since 2007.[22]

41.    Further, on information and belief, Freeman's parents moved into the house in Coldspring in approximately 2020.[23] Jones still owns that house as well.[24] Freeman also

---

[16] Levitin, *supra* note 10 at 373.

[17] Jones' former housekeeper Rosa Lozano testified by deposition in the miscellaneous proceeding brought by the U.S. Trustee that Freeman moved into Jones' house a year and a half after the divorce, which again was in 2012.

[18] Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, at 1; *see also In re Professional Fee Matters Concerning the Jackson Walker Law Firm*, No. 23-00645, ECF No. 600-1 at 19.

[19] *See Van Deelen v. Jones*, No. 23-cv-3729, ECF No. 1-1, App. A, at 5—6.

[20] *See Professional Fee Matters*, No. 23-00645, ECF No. 600-1 at 19.

[21] *See Van Deelen*, No. 23-cv-3729, ECF No. 1-1, App. A, at 5—6.

[22] *See id.* at 6.

[23] *See id.*

[24] *See id.* at 5.

formed the Freeman Family Coldspring Real Estate Holdings, LLC in February 2023, and lists herself as registered agent at ██████████████████████████ less than two miles from the home purchased by Jones.

### III.  Freeman joins Jackson Walker and its bankruptcy practice before Jones skyrockets.

42.     As Jones became "the busiest bankruptcy judge in the United States,"[25] Freeman left her clerkship to join Jackson Walker.[26] Jackson Walker announced Freeman as a partner in 2018, highlighting her former position as "permanent law clerk to the Chief Bankruptcy Judge for the U.S. Bankruptcy Court for the Southern District of Texas."[27]

43.     With Freeman's arrival, Jackson Walker landed appointments in myriad large Chapter 11 cases—usually serving as local counsel with Kirkland.[28] The relationship goes back to 2018. By 2019, Jackson Walker was "the leading local counsel firm for corporate debtors filing for bankruptcy in Houston."[29] In 2022 and 2023, Jackson Walker was number one in the nation in local counsel appointments in large bankruptcies.[30] "Kirkland & Ellis [led] large

---

[25] Tom Hals, Exclusive-Law Firm Tied to Bankruptcy Judge Resignation Did Not Make Conflict Disclosures-Data Analysis, Reuters (Oct. 30, 2023), https://www.usnews.com/news/top-news/articles/2023-10-30/exclusive-law-firm-tied-to-bankruptcy-judge-resignation-did-not-make-conflict-disclosures-data-analysis (last visited Jan. 9, 2026).

[26] Chief Judge Priscilla Richman of the Fifth Circuit stated in her written order that Freeman "was a partner in the Jackson Walker LLP law firm, it appears from at least 2017 until December 2022." Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones at 1.

[27] https://www.jw.com/news/jackson-walker-expands-bankruptcy-reorganization-wealth-planning-and-white-collar-defense-practices/ (last visited Jan. 14, 2026).

[28] See e.g., Brenda Sapino Jeffreys, Kirkland's Bankruptcy Partnership With Jackson Walker Could Be a Sign of Things to Come, The American Lawyer (Online) (Aug. 25, 2020), accessible at https://www.law.com/americanlawyer/2020/08/25/kirklands-bankruptcy-partnership-with-jackson-walker-could-be-a-sign-of-things-to-come/ (last visited Jan. 14, 2026).

[29] Hals, supra note 25.

[30] See https://www.jw.com/news/mention-bankruptcy-top-local-counsel-american-lawyer/ (last visited Jan. 14, 2026).

debtor-side representations … by a significant margin, while Jackson Walker, Kirkland's preferred local counsel in the Southern District of Texas, picked up more local debtor's representations than any other firm."[31] "Kirkland & Ellis, the dominant US debtor law firm, had tapped Jackson as co-counsel in at least 46 large cases since 2018, according to data collected by bankruptcydata.com."[32]

44.     With 200 lawyers in its Houston office, it might be questioned why Kirkland would need local counsel at all. One commentator remarked that "[t]he relationship between the world's only $4 billion firm (Kirkland Ellis) and Jackson Walker … shows that two firms can build a working relationship that goes beyond a traditional referral arrangement."[33]

45.     Indeed, Jackson Walker managing partner Wade Cooper explained that "[i]n an awful lot of the [Chapter 11] cases Kirkland filed, we are either local counsel or co-counsel to help with conflicts[.]"[34] Among other attributes of the Firm, Cooper boasted, "[w]e know a lot about the local politics[….]"[35] In fact, the Financial Times reported that a lawyer from a large bankruptcy firm stated that "Jackson Walker was useful as a back channel to Houston's two judges; Freeman had previously been a clerk to Jones while another bankruptcy partner, Cavenaugh, had clerked for Isgur."[36]

---

[31] Dan Roe, Law.com, Kirkland & Ellis, Jackson Walker Dominate Debtor-Side Bankruptcy as Restructuring Market Heats Up (Aug. 3, 2023), accessible at https://www.law.com/americanlawyer/2023/08/03/kirkland-ellis-jackson-walker-dominate-debtor-side-bankruptcy-as-restructuring-market-heats-up/ (last visited Jan. 14, 2026).

[32] Indap, *supra* note 10.

[33]  Jeffries, *supra* note 28.

[34] *Id.*

[35] *Id.*

[36] Indap, *supra* note 10.

### IV. Kirkland's mass filings in the Southern District coincide with Freeman's arrival at Jackson Walker, which Kirkland uses almost exclusively as "local counsel."

46.    The pairing of Kirkland and Jackson Walker and their collaboration in filing mega-bankruptcies coincided with Freeman's arrival at Jackson Walker. Kirkland worked with Jones to make Houston the premiere forum for mega-bankruptcies.[37] Once Freeman joined Jackson Walker, Kirkland began filing dozens of mega-bankruptcies in the Southern District of Texas with Jackson Walker as local counsel. The timing is uncanny. Since 2019, Kirkland filed 46 mega-bankruptcies in the Southern District of Texas.[38] In at least 43 of those 46 cases, Kirkland selected Jackson Walker as local counsel.[39]

47.    Of course, since at least 2011, Jackson Walker also had an attorney, Cavenaugh, who clerked for bankruptcy judges in the Southern District. But the onslaught of joint filings followed Freeman's arrival in 2018, not Cavenaugh's in 2011. According to Plaintiff's counsels' research, Kirkland did not file any mega-bankruptcies with Jackson Walker as local counsel from January 2006–January 2016. In fact, it did not file any mega-bankruptcies in the Southern District of Texas at all during that period.

48.    Freeman was an essential part of mega-bankruptcy filings in Houston, spearheading the cases where Kirkland retained Jackson Walker as local counsel. In Jackson Walker's own words:

> Elizabeth enjoyed quick and substantial success at Jackson Walker. From the time of her arrival through today [August

---

[37] *See* General Order 2018-6, (Bankr. S.D. Tex. June 29, 2018) (listing James Sprayregen on the committee).

[38] Indap, *supra* n. 10.

[39] *See Van Deelen v. Jones, et al.*, No. 23-3729, ECF No. 64-1 (listing Kirkland filings of mega-bankruptcies in the Southern District of Texas and identifying those in which Jackson Walker served as local counsel). Although the chart lists 42 cases, it incorrectly lists *Jones Energy* as a case in which Jackson Walker did not serve as local counsel.

2021], Houston has become a favored venue for complex debtor cases, in the energy industry and more broadly. Complex cases filed in the Southern District are assigned either to Judge Marvin Isgur or Judge Jones. Jackson Walker's debtor practice grew very substantially during this time, including cases in which we took an expansive local counsel role, with Kirkland Ellis acting as lead counsel, and cases in which we were lead debtor's counsel. Much of this work was in cases before either Judge Isgur or Judge Jones. This success was a team effort, involving other bankruptcy partners as well, but Elizabeth's leadership and contribution were recognized as integral.[40]

49.    Moreover, the pairing of Kirkland and Jackson Walker in Houston-filed mega-bankruptcy cases was so pervasive that it caught the attention of the press, both before and after revelation of the intimate Jones-Freeman relationship.[41]

**V.    Kirkland, Jackson Walker, and Freeman collect millions of dollars in cases before Jones without disclosing the intimate relationship.**

50.    While Freeman and Jones were living together and having an intimate relationship, Jones awarded Kirkland at least $162 million in cases with Freeman and Jackson Walker serving as local counsel. Never once did Kirkland disclose what it knew of the Jones-Freeman relationship. Jones also awarded Jackson Walker at least $12 million, including approximately $1 million in fees billed directly by Freeman herself.[42] Of course, "at all times when Elizabeth Freeman was a Jackson Walker LLP partner, and regardless of whether she provided services or advice in a case, there is a reasonable probability that [she], as a partner in that firm, obtained a financial benefit from, or had a financial interest in, fees approved by

---

[40] *In re 4E Brands*, No. 22-50009, ECF No. 526-1 at 2.

[41] *See e.g.,* Indap, *supra* n. 10.

[42] *Chesapeake*, No. 20-33233, ECF No. 4514 at ¶ 5.

Judge Jones."[43] As co-owner of a shared home with Freeman, Jones also benefitted from the fees he awarded to her as well. In fact, Freeman shared expenses on the home, including paying a portion of real property taxes.

51. Jones did not recuse or disqualify himself in any of these cases, nor did he disclose his relationship with Freeman to the parties, their counsel, or those otherwise affected by the bankruptcies. Meanwhile, under the rules governing bankruptcy proceedings for a law firm to be employed by a debtor or debtor-in-possession, the firm must show that it is *disinterested* and must disclose all "connections[.]" 11 U.S.C. §§ 101(14), 327; Fed. R. Bankr. P. 2014. Fiduciary obligations and the disciplinary rules also mandated disclosure of the Jones-Freeman relationship Yet, neither Freeman, Jackson Walker, nor Kirkland disclosed it in any of the cases.

### VI. Jackson Walker claims it learned of the relationship in March 2021, discloses it to Kirkland, and both continue hiding the relationship.

52. Jackson Walker claims it first learned of the Jones-Freeman relationship in March 2021[44] even though Freeman was in the relationship and living with Jones during her entire employment at Jackson Walker, and the firm's increased appointments before Jones coincided precisely with her arrival. According to Jackson Walker, it learned of the relationship after receiving an email on March 6, 2021 from a participant in the McDermott International, Inc. bankruptcy, and that Freeman then "confirmed that there had been a

---

[43] Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, at 2.

[44] Alexander Gladstone, Justice Department Watchdog Disputes Texas Firm's Fees Over Lawyer's Relationship with Judge, Wall Street Journal (Nov. 3, 2023), accessible at https://www.wsj.com/articles/doj-watchdog-seeks-to-reverse-some-fees-paid-to-law-firm-jackson-walker-7b50a000?tpl=br (last visited Jan. 9, 2026).

romantic relationship."[45] The firm maintains Freeman indicated her intimate relationship with Jones was in the past,[46] that it ended "prior to March 2020,"[47] and that they "each own their own homes" and "do not and have not lived together."[48]

53.    Jackson Walker then consulted outside ethics counsel and instructed Freeman to stop working and billing on any case assigned to Jones.[49] It acknowledged the risk that the relationship posed to the firm, noting that "[t]he firm, for its part, had concluded and has advised Elizabeth that any romantic, intimate, or sexual relationship between a firm lawyer and a federal judge would create too much risk of disqualification to be compatible with any lawyer in the firm continuing to appear before that judge."[50]

54.    As it turns out, text messages uncovered in the U.S. Trustee proceeding indicate that at least some Jackson Walker attorneys knew of the nature of the Jones-Freeman relationship long before March 2021.[51] Additionally, in March 2021, after Freeman "confirmed that there had been a romantic relationship[,]" Jackson Walker "disclosed these matters to our Kirkland co-counsel, who disclosed them to the client."[52] Thus, Kirkland as a firm knew of the intimate relationship between Jones and Freeman, at least in the past, by March 2021. Again, however,

---

[45] *4E Brands*, 22-50009, ECF No. 526-1 at 4.

[46] *Id.* at ECF No. 526 at 1, 4.

[47] *Id.* at 4.

[48] *Id.*

[49] Alexander Gladstone, et al., Bankruptcy Judge Jones to Stop Handling Major Cases After Relationship with Lawyer Revealed, Wall Street Journal (Oct. 14, 2023), https://www.wsj.com/articles/bankruptcy-judge-jones-to-stop-handling-complex-cases-after-relationship-with-lawyer-revealed-fad88b0c?tpl=br (last visited Jan. 9, 2026).

[50] *In re J.C. Penney Direct Mktg. Servs., LLC*, No. 20-20184, ECF No. 1244 (Bankr. S.D. Tex. Nov. 13, 2023).

[51] *See e.g., Old Copper Company Inc.*, No. 25-02002, ECF No. 1-1 at 10.

[52] *4E Brands*, No. 22-50009, ECF No. 526 at 2–3.

counsel for the Creditors' Committee in Chesapeake indicated Kirkland knew all along. This is consistent with reporting indicating that partners at Kirkland "were *long aware* of the romantic relationship between the pair, though [they] did not know how advanced it was."[53]

55.     Despite Jackson Walker's and Kirkland's knowledge, neither firm disclosed the Jones-Freeman relationship in the Chesapeake bankruptcy or in *any* bankruptcy before Judge Jones between March 2021 or December 2022, when Freeman left Jackson Walker. In fact, neither firm *ever* disclosed it.

56.     Jackson Walker has claimed it believed disclosure was unnecessary because Freeman indicated the relationship was over. Even if she had, the firms had an obligation to disclose the recent relationship between the presiding judge and its partner.[54] That is particularly so because the firms' applications for appointment and supporting declarations were filed while the relationship *was ongoing*. At the very least, the firms had a duty to correct their inaccurate and misleading filings. Indeed, "[t]he Fifth Circuit has uniformly held that under Rule 2014(a), full disclosure is a continuing responsibility, and an attorney is under a duty to promptly notify the court if any potential for conflict arises." *Beirne, Maynard & Parson, L.L.P. v. Cypresswood Land Partners*, 2010 U.S. Dist. LEXIS 146549, *25-26 (citing *In re W. Delta Oil Co.*, 432 F.3d 347, 355 (5th Cir. 2005)).

---

[53] Indap, *supra* note 10.

[54] Other firms disclose much lesser connections to court personnel in applications to be retained. For example, Gray Reed disclosed that while Judge Jones "was attending law school, he worked on a part-time basis for Gray Reed assisting with Gray Reed's IT systems." *In re Whiting Petroleum Corp., et al.*, No. 20-32021, ECF No. 308-2, Schedule 2 (May 8, 2020); Hals, *supra* note 25 ("disclosing connections to judges appears to be a standard practice. In the court filings Reuters reviewed, the larger national law firms that worked for the debtor alongside Jackson Walker always indicated that they had searched for connections to the judges on the bankruptcy court").

57.     Further, had Jackson Walker or Kirkland performed even a cursory real-property records search instead of relying on Freeman, who they knew had already been dishonest, there would have been no room for doubt. The public records would have shown the co-owned home in Houston[55] as well as the home Jones purchased where Freeman's parents had been residing in Coldspring.[56] Jackson Walker and Kirkland instead accepted Freeman's flimsy denial, which could have been debunked with minimal investigation or by talking with other partners, including those from Kirkland. They chose not to take appropriate steps to confirm the relationship because they wanted to continue profiting from it.

58.     Of course, even if there had been the remotest of possibility that Freeman was the only one at Jackson Walker with knowledge, as an attorney and partner at Jackson Walker, Freeman's "[k]nowledge and actions are said to be imputed to all members of a firm[.]"[57] Freeman's actions benefitted the Firm with coveted appointments and millions of dollars in attorneys' fees, meaning the Firm and its partners are charged with knowledge of the intimate relationship and their shared home even if the firm's leadership has to some extent claimed ignorance.[58]

---

[55] *See* Alexander Gladstone & Akiko Matsuda, Texas Law Firm Sys Former Partner Lied About Relationship With Judge, WSJ.COM (Nov. 13, 2023), accessible at https://www.wsj.com/articles/texas-law-firm-says-former-partner-lied-about-relationship-with-judge-9a62a69f (last visited Jan. 9, 2026).

[56] *See Van Deelen*, No. 23-cv-3729, ECF No. 1-1, App. A, at 6.

[57] *In re Bradley*, 495 B.R. 747, 791 (Bankr. S.D. Tex. 2013) (citing *In re Depugh*, 409 B.R. 125, 141 (Bankr. S.D. Tex. 2009); *In re Anderson*, 330 B.R. 180, 187 (Bankr. S.D. Tex. 2005) (finding that knowledge and actions impute from one attorney at a firm to all other attorneys with whom they work)); *see also In re Corrugated Container Antitrust Litigation*, 659 F.2d 1341, 1346 (5th Cir. 1981) ("knowledge is imputed to partners of the lawyer disqualified, even if the partnership is later dissolved") (citations omitted).

[58] "[I]mputation turns on whether the agent was acting for or against the principal's interest; knowledge acquired by an agent acting adversely to his principal is not attributable to the principal." *Reneker v. Offill*, 2012 U.S. Dist. LEXIS 83017, 2012 WL 2158733, at *11 (N.D. Tex. June 14, 2012) (citing *Askanase v. Fatjo*, 828 F. Supp. 465, 470 (S.D. Tex. 1993)).

## VII.    Communications among Jackson Walker attorneys indicate knowledge of the relationship and a cover up.

59.    As it turns out, Jackson Walker's denial was feigned at best. Multiple Jackson Walker

attorneys long knew of the Jones-Freeman relationship, and that it was *not* a thing in the past.

In May 2021, Jackson Walker attorney Veronica Polnick texted Freeman that "[JW attorney

Genevieve Graham] obviously knows you *have* a relationship with Jones and she now knows

that it quasi came out in McDermott and that there's high level firm shit going on."[59]

60.    Messages also suggest recognition of the need to address previously filed declarations

in bankruptcies. Cavenaugh texted on March 9, 2021, that he spent three hours the day before

re-reading his declarations in prior cases.[60] Additionally, messages between Cavenaugh and

Polnick show that almost immediately after the Van Deelen accusations in March 2021,

Jackson Walker knew the significance of the relationship, which threatened their lucrative

practice:

> Polnick (March 7, 2021, 9:23 p.m.) "This is literally [F]reeman's worst nightmare. She's the most private person I know."
>
> Cavenaugh (March 7, 2021, 9:24 p.m.) "I know. I feel so terrible. But if we want to protect her, this is the route. It's gonna be [fine.]"
>
> Polnick (March 7, 2021, 9:25 PM) "You think we get out of this with 1) freeman still at JW, 2) Jones still on the bench and panel, and 3) still working with KE?"
>
> Cavenaugh (March 7, 2021, 9:25 PM) "All 3[.]"
>
> Polnick (March 8, 2021, 8:58 p.m.) "There's going to be some embarrassment. But it's going to be ok. Make sure she knows that."

---

[59] *Professional Fee Matters*, 23-00645, ECF No. 600-2 PDF p. 87.

[60] *Old Copper*, No. 25-02002, ECF No. 1-1 at 5.

Cavenaugh (March 8, 2021, 8:56 p.m.) "Ok. Do you believe that?"

Polnick (March 8, 2021, 8:56 p.m.) "More today than yesterday, yes."

Polnick (March 8, 2021, 8:56 p.m.) "Mainly Bc Isgur is ok[.]"

"Doesn't mean it's not gonna suck for a bit[.]"

Cavenaugh (March 8, 2021, 8:57 p.m.) "Yup. Just FYI, the firm is going to have a reaction, regardless of what the court does. It will probably mean that Liz can't work on DRJ cases until the dust settles. So we need to be prepared for that[.]"

Polnick (March 8, 2021, 8:56 p.m.) "Yup. Not surprised. Like walled off you mean. It'll be ok. We can handle that."

Cavenaugh (March 8, 2021, 8:58 p.m.) "Yes[.]"

Polnick (March 8, 2021, 8:58 p.m.) "We know what he'll do, we can cover until that passes."

Cavenaugh (March 8, 2021, 8:59 p.m.) [Liked Polnick's prior message][61]

61.    The text messages also indicate that several senior Jackson Walker partners, including its former General Counsel, Patrick Cowlishaw, knew about the relationship at least as early as March 7, 2021, and collaborated on a strategic response of nondisclosure:

Polnick (March 7, 2021) "How's Bruce [Ruzinsky]?[62]

Cavenaugh (March 7, 2021) "He's good. It's been a day. Just so you know, the circle includes Bruce, [C]hip, and Cowlishaw."

Cavenaugh (March 7, 2021, 9:23 p.m.) "They are all good[.]"

---

[61] *Id.* ECF No. 12-9 at 12–13.

[62] https://www.jw.com/people/bruce-ruzinsky/.

Cavenaugh (March 7, 2021, 9:23 p.m.) "They are also signed off on the plan[.]"[63]

62.    Further, messages between Freeman and Polnick a year earlier, in May 2020, offer a glimpse into the scheme to control the process. Three days before Jackson Walker filed Chapter 11 bankruptcy for JCPenney, in a case in which Kirkland would once again serve as lead counsel, Freeman texted Polnick, "Talked to Jones. He's got us."[64] Freeman told Polnick that there were "too many fights" in the JCPenney case and that they couldn't afford a "process hawk," referring to Judge Isgur.[65] Judge Isgur would instead get the bankruptcy of Ultra Petroleum Corp., Freeman told Polnick.[66] Ultra, represented by Kirkland and Jackson Walker, filed for Chapter 11 the day before JCPenney, and was assigned to Judge Isgur, just as Freeman said. Freeman explained that "[t]hey know Jones will cut through the bullshit," and it was "[n]ot so much a case of dodging Isgur[.]"[67] Freeman also told Polnick that "Jones has been softening up for this for a month."[68] Finally, Freeman instructed Polnick, "[w]e are keeping this down loooooooowww[.]"[69] Polnick replied, "Got it[.]"[70]

---

[63] *Old Copper*, No. 25-02002, ECF No. 12-9 at 4-5.

[64] *Id.* ECF No. 12 at 6, 12-7 at 3–4 (pdf pp. 90–91).

[65] *Id.* ECF No. 12-7 at 3 (pdf p. 90).

[66] *Id.*

[67] *Id.* at 3–4 (pdf. pp. 90–91).

[68] *Id.* at 4 (pdf p. 91).

[69] *Id.*

[70] *Id.*

### VIII. Freeman remains at Jackson Walker after March 2021, still living with and in an intimate relationship with Jones, while Jackson Walker and Kirkland continue hiding it.

63.    Despite Jackson Walker's and Kirkland's indisputable knowledge of the relationship at least by March 2021, and some of their lawyers' knowledge of it before then, the firms continued not to disclose what they knew in bankruptcy proceedings. Freeman continued to work on cases assigned to or involving Jones for Jackson Walker behind the scenes between March 2021 and December 2022, and then as a contract attorney after her nominal departure from Jackson Walker. During this time, Jackson Walker continued to benefit from the Jones-Freeman relationship, filing at least nine applications to be appointed counsel in bankruptcy cases before Jones.[71] In two of those cases, Jackson Walker listed Jones as a potential party in interest, but affirmatively represented that it searched his name against internal records and did not find any connections involving him.[72] Kirkland also continued to profit after March 2021 in cases before Jones with Jackson Walker and Freeman at its side. After the March 2021 disclosure, Kirkland filed at least three applications for appointment as counsel for debtor in cases in which Jackson Walker served as its local counsel.[73] And it collected at least

---

[71] *Seadrill Limited*, No. 21-30427, ECF No. 250 (Mar. 8, 2021); *Brilliant Energy, LLC*, No. 21-30936, ECF No. 68 (Apr. 13, 2021); *Katerra Inc.*, No. 21-31861, ECF No. 289 (Jun. 29, 2021); *Basic Energy Services, Inc.*, No. 21-90002, ECF No. 809 (Dec. 13, 2021); *Strike LLC*, No. 21-90054, ECF No. 363 (Jan. 6, 2022); *Seadrill New Finance Limited*, No. 22-90001, ECF No. 94 (Feb. 8, 2022); *4E Brands*, No. 22-50009, ECF No. 72 (Mar. 24, 2022); *Sungard AS New Holdings*, No. 22-90018, ECF No. 211 (May 10, 2022); *LaForta Gestao e Investments*, No. 22-90126, ECF No. 67 (Jul. 15, 2022).

[72] *See In re Strike, LLC, et al.*, 21-90054, ECF No. 363 Ex. B at ¶¶ 4–5, 15, Schedule 1 (Jan. 6, 2022); *In re Katerra Inc., et al.*, 21-31861, ECF No. 289 Ex. B at ¶¶ 4–5, 15, Schedule 1 (June 29, 2021).

[73] *See Seadrill Limited,* No. 21-30427, ECF No. 242; *Katerra Inc.,* No. 21-31861, ECF No. 244; *Seadrill New Finance Limited,* No. 22-90001, ECF No. 92.

$86 million in attorneys' fees awarded by Jones in orders issued after March 2021,[74] when Jackson Walker had already informed it of the Jones-Freeman relationship. This includes more than $23 million awarded to Kirkland in the Chesapeake bankruptcy in April 2021.[75] In each case, Kirkland failed to disclose the Jones-Freeman relationship despite its knowledge of the relationship, and despite its awareness that Jackson Walker affirmatively listed Jones as a potential party in interest and represented that it did not find any connections.

### IX.    Jackson Walker admits it knew of the ongoing nature of the Jones-Freeman relationship by March 2022; yet the parties continue to hide it and profit.

64.    In February or March 2022, a Jackson Walker partner received information from a colleague that, despite Freeman's prior representations, her relationship with Jones was anything but over. Jackson Walker again confronted Freeman, who claimed that the relationship had been "rekindled." Shockingly, Jackson Walker again took no action to disclose the relationship in any proceeding despite advice from ethics counsel at Holland & Knight that the relationship *should* be disclosed. Jackson Walker initially worked with their expert and Freeman's attorney (Kirkendall) on an appropriate disclosure because "[t]he law firm knew the status quo was not appropriate[.]"[76]

---

[74] *JC Penney, Company Inc.,* No. 20-20182, ECF No. 2865 (Jones awarding Kirkland $17,581,886 on April 7, 2021, in case with Jackson Walker); *Chesapeake,* No. 20-33233, ECF No. 3541 (Jones awarding Kirkland $23,448,619.50 on April 26, 2021, in case with Jackson Walker); *In re Tug Robert J. Bouchard*, No. 20-34758, ECF No. 39 (Jones awarding Kirkland $14,017,042.50 on October 29, 2021, in case with Jackson Walker); *Mule Sky LLC,* No. 20-35561, ECF No 72 (Jones awarding Kirkland $15,605,476 on July 21, 2021, in case with Jackson Walker); *Seadrill Partners, LLC,* No. 20-35740, ECF No. 674 (Jones awarding Kirkland $2,219,555 on August 3, 2021, in case with Jackson Walker); *Katerra Inc.,* No. 21-31861, ECF No. 1631 (Jones awarding Kirkland $12,920,192.21 on January 26, 2022, in case with Jackson Walker); *Seadrill New Finance Limited,* No. 22-90001, ECF No. 106 (Jones awarding $212,994 to Kirkland on March 10, 2022, in case with Jackson Walker).

[75] *Chesapeake,* No. 20-33233, ECF No. 3541.

[76] *In re Neiman Marcus Group LTD LLC, et al.*, No. 20-32519, ECF No. 3234, ¶ 50.

65.     In an April 2022 email exchange with fellow Jackson Walker attorneys, managing partner Wade Cooper described some of the firm's concerns over questions that would follow any disclosure:

> How are Liz, Judge Jones, and the Firm going to address press and other inquiries that may follow the making of such a disclosure, e.g., "what is meant by 'close personal relationship'"?, Does this disclosure mean that Mr. Van Deelen's allegations of a romantic relationship were correct? Or that such a relationship now exists? If so, why wasn't this disclosure made earlier? Has this relationship been a factor, or the driving factor, in the rise to prominence of JW's bankruptcy practice in Houston?[77]

66.     Rather than face these uncomfortable questions and jeopardize its profitable bankruptcy practice, the firm decided to continue hiding the relationship. Besides collaborating with Freeman and ethics counsel, Jackson Walker (through Cavenaugh) actually met with Jones regarding proposed disclosures. According to Jackson Walker, during that meeting Jones "insinuated that he was unhappy with JW's insistence on a full and complete disclosure and Ms. Freeman's exit."[78] Jones handed Cavenaugh his own proposed disclosure, said he "need[ed] to make this happen[,]"[79] but the firm found it to be "insufficient, inadequate, and misleading[.]"[80] Indeed, Jones' proposed disclosure provided no discussion of the intimate, live-in relationship, and deceptively buried disclosure of a "close personal relationship" with Freeman by surrounding it with similar discussion of Jones' and Isgur's

---

[77] *Professional Fee Matters*, 23-00645, ECF No. 600-6 PDF page 178.

[78] *Neiman Marcus*, No. 20-32519, ECF No. 3234 ¶55.

[79] *Id.* ¶56.

[80] *Id.* ¶57.

social relationships with other Jackson Walker attorneys.[81] Dissatisfied with the lack of candor in Jones' proposed disclosure, Jackson Walker opted to disclose nothing.

67.    Jackson Walker's ethics counsel issued a memorandum on May 31, 2022 advising it to disclose the relationship.[82] According to Jackson Walker's expert, "[i]t is believed that several JW attorneys in the bankruptcy group have known about the Relationship for some time, but have failed to make any disclosures on the record that JW has a conflict in appearing before Judge Jones."[83] He concluded that "[b]ecause of the Relationship, JW is required to disclose the Relationship to both its clients with cases before Judge Jones as well as on the record in those cases before Judge Jones."[84]

68.    Still, Jackson Walker did not disclose the relationship. Neither did Kirkland, Freeman, or Jones. By June 2022, Jackson Walker "believed Ms. Freeman's departure from the law firm was the only path forward."[85] Accordingly, Jackson Walker and Freeman began a months-long process of negotiating Freeman's departure from the firm, presumably to bury the firm's connection to the relationship and avoid disclosure.[86] In fact, they negotiated to contractually bind each other *not* to disclose the relationship.

---

[81] *Id.* ¶56.

[82] *Old Copper*, No. 25-02002, ECF No. 12-12 at p. 26–30.

[83] *Id.* at p. 29.

[84] *Id.*

[85] *Neiman Marcus*, No. 20-32519, ECF No. 3234 ¶53.

[86] Even then, this "separation" was window-dressing to create an appearance of propriety; a fig-leaf for an improper relationship that Jackson Walker knew about and wanted to continue for its own profit. Freeman's firm website did not identify a physical address, listing a P.O. Box in downtown Houston at a U.S. Post Office location. Even after the so-called "separation," Freeman continued to use Jackson Walker offices to conduct work, collaborate with Jackson Walker lawyers, and even held mediations there through at least March 2023. *See* Indap, *supra* note 10 ("After leaving Jackson Walker, Freeman established the Law Office of Liz Freeman.

### X.    Chesapeake files for bankruptcy.

69.    In this context, Chesapeake filed bankruptcy in the Southern District of Texas on June 28, 2020, despite being an Oklahoma based company. Kirkland was tapped to be Chesapeake's lead counsel, with Jackson Walker local and conflicts counsel. The case was assigned to Jones.

70.    On July 16, 2020, Kirkland caused to be filed an application to be employed as Chesapeake's counsel, including a declaration of disinterestedness by Patrick Nash in support of Kirkland's application without disclosing the Jones-Freeman relationship.[87] Of note, the declaration listed Judge David Jones as a party against whom a conflict search was run.[88] Curiously, Kirkland on the same day caused to be filed a motion to seal the names of certain interested parties related to its application.[89] Kirkland's application was approved on by Jones on August 12, 2020.[90]

71.    Also on July 16, 2020, Jackson Walker caused to be filed an application to be employed as local and conflicts counsel for Chesapeake, including a declaration of disinterestedness by Cavenaugh in support of the application without disclosing the Jones-

---

Business was immediately brisk; Jackson Walker has hired her as a contract attorney or co-counsel on multiple occasions in 2023, even letting her occasionally use a conference room, according to a person familiar with the matter.").

[87] *Chesapeake*, No. 20-33233, ECF No. 372.

[88] *Id.* ECF No. 372, schedule 1(e) (pdf p. 46).

[89] *Id.* ECF No.381.

[90] *Id.* ECF No.786.

Freeman relationship.[91] Jackson Walker's application was approved by Jones on August 12, 2020.[92]

72.    On August 12, 2020, Brown Rudnick submitted an application to serve as counsel for the Creditors' Committee, including a declaration of disinterestedness by Stark, without disclosing the Jones-Freeman relationship.[93] Brown Rudnick's application was approved by Jones on September 10, 2020.[94] While specifically referencing Jones as a person included on the conflicts check,[95] the firm failed to disclose the Jones-Freeman relationship despite its actual knowledge of the intimate nature of the Jones-Freeman relationship. Specifically, Brown Rudnick partner Stark admitted, in conversation with EJS corporate contact Sofio in October 2023, that Stark knew about the relationship for the entirety of the bankruptcy.

73.    At the *outset* of the Chesapeake bankruptcy, Plaintiff objected to deficiencies in the debtor's disclosures related to (1) lack of clarity about the debtor's relationships with its bankruptcy professionals and affiliates, (2) inadequate representations concerning fees to be paid to professionals, (3) broad releases being proposed for all constituencies and their Affiliates and Related Parties, and (4) $25 million in bonuses that were being paid to key executives shortly before the bankruptcy filing.[96]

74.    Of course, what Plaintiff and others could not have known is that the judge and a key restructuring partner were all but married and controlling everything through the cooperation

---

[91] *Id.* ECF No.370.

[92] *Id.* ECF No.720.

[93] *Id.* ECF No.725.

[94] *Id.* ECF No. 1131.

[95] *Id.* ECF 725-1.

[96] *Id.* ECF No. 1401.

of her firm and Kirkland. The RICO Defendants made sure Plaintiff and others did not know

so they could not object. Disclosure would have meant disqualification for Jones, loss of

employment, liability across dozens of bankruptcies for all participants, public

embarrassment, and of course, loss of control over the process.

**XI.    Freeman, Jackson Walker, and Kirkland advocate for an unlawful plan that gives a windfall to senior institutional creditors at the expense of junior creditors.**

75.    As the bankruptcy proceedings progressed, Plaintiff's concerns about inequitable and

collusive conduct became further substantiated, though like everyone else, Plaintiff could not

identify the source of the collusion. When a proposed plan of reorganization was developed,

Plaintiff objected to the rights offering in the plan as an inappropriate value transfer from other

creditors to first lien creditors. The plan would strip Plaintiff and other Class 5, 6 and 7

creditors of millions of dollars in value while providing first lien creditors an unprecedented

and illegal 200+% return on the pre-bankruptcy value of their claims. *See Breitburn Energy*, 582

B.R. at 350 (noting that senior creditors cannot receive more than full compensation until all

creditors have been made whole under corollary to absolute priority rule). This outrageous

misallocation of the company's post-bankruptcy equity, along with reimbursement of

professional fees, and participation in the confirmed plan's rights offering of new post-

bankruptcy equity shares all resulted in a tremendous loss in value for Plaintiff and other Class

5, 6, and 7 creditors. All of this was accompanied by overly broad releases and exculpation

provisions in favor of RICO Defendants.

76.    Notably, the proposal brought forward by Kirkland and Jackson Walker was premised

on valuing Chesapeake at $3.25 billion despite the fact that as the bankruptcy progressed, the

value of the company, because of market movement and the rebound of natural gas and

31

petroleum prices following the Covid-19 outbreak, continued to increase—first to $4.1 billion and then, even as reportedly calculated by Jones, to $5.1 billion.[97] Because of the tremendous undervaluation underlying the confirmed plan, the rights offering interests were immensely more valuable than the plan acknowledged—by hundreds of millions of dollars or more—and were primarily reserved to Class 4 even though they were already being made more than whole. Meanwhile, using the lower valuation as justification, the plan limited Class 5 to 11.25% of the rights offering and excluded Classes 6 and 7 entirely. The result was a 200+% recovery for Class 4 while Classes 5 and 6 received pennies on the dollar. When Plaintiff complained to Brown Rudnick as counsel for the Creditors' Committee, Stark told Plaintiff it would not be heard unless Plaintiff could bring its own financial backing for an alternative rights offering proposal. Although Plaintiff did just that, the effort would prove futile.

77.     Plaintiff was able to raise up to $750 million in funding—a task readily accomplished because of the magnitude of waste in the plan supported by RICO Defendants. Essentially, the willful blindness of the confirmed plan's rights offering was so egregious and apparent that financers were eager to commit to Plaintiff's proposed alternative plan. On January 13, 2021, Plaintiff, through counsel, submitted its alternative proposed plan that would have benefitted the entire Chesapeake estate, and therefore Plaintiff and all other creditors.[98] This significant value was achieved by a higher strike price—which would result in issuance of less stock in the new rights offering, and notably Plaintiff's willingness to backstop this plan for $70 million

---

[97] *Id.* ECF No. 2815 at 334–36.

[98] *Id.* ECF No. 2835.

instead of the $250 to $500 million that was demanded and agreed to as a backstop fee in the plan that was eventually confirmed.

78.    Given the patently unlawful plan proposed by Kirkland and EJS's far superior alternative that EJS believed would be backed by Stark, EJS was convinced that something other than Kirkland's plan would ultimately be adopted. As such, EJS continued to purchase unsecured bonds during the pendency of the bankruptcy. The bonds could be purchased below face value and EJS considered them a sound investment given Chesapeake's fundamental financials and reasonable valuations.

79.    However, Stark inexplicably refused to endorse the plan and Jones refused to give any meaningful consideration to the merits of Plaintiff's proposal.[99] Instead, Jones acknowledged the possibility that he based his rights offering ruling on incorrect assumptions or insufficient information but was not willing to reconsider his decision.[100]

80.    The plan that was ultimately forced through and approved by Jones was inequitable to the point of absurdity. The plan provided first lien creditors (Class 4) with a 200+% recovery on the face value of their claims—far exceeding the value of their pre-bankruptcy claims—through a combination of excessive allocation of the company's post-bankruptcy equity, a dominant share in the new rights offering, and reimbursement of professional fees that they incurred. In contrast, Class 6 unsecured bondholders, including EJS, faced extremely low recoveries (as little as 4%), despite holding approximately $3 billion in claims.

---

[99] *Id.* ECF No. 2906 at 257-62.

[100] *See id.*

81.    Beyond the obscene recovery for Class 4, the rights offering embedded in the plan acted as a significant value transfer from junior creditors to senior creditors. The structure allowed first lien creditors to capture the majority of the value created by the company's post-bankruptcy equity, while Classes 5, 6, and 7 were stripped of hundreds of millions in potential recoveries. In addition to the bond-related losses, creditors in the subordinate classes were not provided a proportionate opportunity to participate in the rights offering that was part of Chesapeake's emergence from bankruptcy, denying them opportunity to counter the losses from their bonds by capturing equity that would have appreciated after Chesapeake exited bankruptcy.

82.    The plan was premised on a Chesapeake valuation of $3.25 billion, even as the company's value increased to $4.1 billion and then at least $5.1 billion during the proceedings. Despite these increases, the allocations to creditors did not change to reflect the improved financial outlook, resulting in windfall recoveries for senior institutional creditors and huge losses for others.

83.    Plaintiff's proposed alternative plan would have taken advantage of up to $1 billion more in value to the estate, benefitting all creditors, and equitably allocated nearly $2 billion more to Classes 5 and 6, including a higher rights offering strike price and a much lower backstop fee ($70 million vs. $250–$500 million). This alternative would have increased recoveries for Class 6 creditors from 4% to 50% and for Class 5 from 22% to 69%, while still ensuring a 100% recovery for Class 4. The confirmed plan's rights offering and backstop arrangement resulted in outrageously excessive compensation to more senior creditors. Again, this alternative proposal was summarily dismissed by Jones, Kirkland and Jackson Walker without genuine consideration, even though Plaintiff was able to raise $750 million

in funding to support it. Absent collusion, no reasonable judge would have approved the egregious 200+% recovery for Class 4 in the face of 22% and 4% recoveries for Class 5 and 6.

84.     Kirkland, Jackson Walker, Freeman, and Jones colluded to unlawfully benefit only certain creditor groups—major institutional creditors who are key repeat players in the bankruptcy universe—and wholly ignored the lack of transparency and due process in the consideration of alternative proposals. One can imagine the motivating factors that would lead the Defendants to benefit these repeat players at the expense of everyone else. Plaintiff's objections and proposals were dismissed unless they could bring new financing, which they did, only to have their plan ignored still. Counsel for the Creditors' Committee, Brown Rudnick, curiously made no effort to advocate for Plaintiff's proposed plan that would have substantially benefitted Class 5 and 6, including Plaintiff, instead of the egregious and unlawful favoritism shown Class 4. While the justification for abandoning Plaintiff's alternative plan was enigmatic at the time, the lead attorney for the Creditors' Committee subsequently acknowledged to Plaintiff that he had known of the Jones-Freeman relationship during the entire pendency of the Chesapeake bankruptcy and that he was aware that Kirkland attorneys knew as well. No disclosure was ever made to the unsecured creditors or the bankruptcy court.

85.     In sum, the inequitable plan confirmed by Jones at the insistence of his co-conspirators unjustly enriched senior institutional creditors by nearly $2 billion at the expense of junior and retail creditors, including individual bondholders and retirement mutual funds, ignored accurate and improved company valuations, rejected superior alternative plans put forward by non-conspirators, and exhibited hallmark signs of collusion. Neither Plaintiff nor any of the Class 5 and 6 creditors were able to identify the source of the collusion because Defendants

were actively concealing it. The Chesapeake plan, in its wildly inequitable distribution, was unlawful, and would have never been approved in the face of the competing alternative plan, absent collusion. The result was tremendous losses to Plaintiff and similarly situated creditors.

## XII. Kirkland, Jackson Walker and Brown Rudnick, all with knowledge of the relationship, move for and are awarded fees by Jones without disclosure.

86.      On January 26, 2021, Kirkland filed its first fee application seeking $8,746,427.50 in fees and $121,613.83 in expenses.[101] Yet again, Kirkland failed to disclose the Jones-Freeman relationship. Jones granted Kirkland's fee request in full on February 23, 2021.[102]

87.      On March 26, 2021, Kirkland filed its final fee application seeking an aggregate $23,448,619.50 in fees and $490,310.70 in expenses.[103] Once again, Kirkland failed to disclose the Jones-Freeman relationship despite having recently been informed by Jackson Walker of it earlier the same month. Jones granted Kirkland's fee request in full on April 26, 2021.[104]

88.      On November 25, 2020, Jackson Walker filed its first fee application seeking $255,505.00 in fees, of which $53,392.50 were for work performed by Freeman, and $4,299.10 in expenses.[105] Jackson Walker and Freeman failed to disclose the Jones-Freeman relationship in the application. Jones granted Jackson Walker's request in full on December 21, 2020.[106]

89.      On March 24, 2021, Jackson Walker filed its second and final fee application seeking $657,237.00 in fees, of which $138,860.00 were for work performed by Freeman, and

---

[101] *Id.* ECF No. 2977.

[102] *Id.* ECF No. 3123.

[103] *Id.* ECF No. 3333.

[104] *Id.* ECF No. 3541.

[105] *Id.* ECF No. 1928.

[106] *Id.* ECF No. 2583.

$16,976.84 in expenses.[107] Jackson Walker and Freeman failed to disclose the Jones-Freeman relationship in the application, despite admission of the relationship having been acknowledged by Freeman at least as to its past existence. Jones granted Jackson Walker's request in full on April 21, 2021.[108]

90.    Notably, Jackson Walker has claimed in related litigation that Freeman would not appear before Jones due to a standing practice that former staff attorneys or clerks would not appear before their former employer-judge for a period of time equivalent to the length of their clerkship.[109] It is clear that Jackson Walker failed to enforce this standard for Freeman, as just two years after leaving her clerkship, she billed hours upon hours of time in the Chesapeake bankruptcy for attending hearings and status conferences, cryptic entries for conferences with the court, and even attended the entirety of the two-week confirmation hearing before Jones.

91.    On November 20, 2020, Brown Rudnick filed its first fee application for work nominally performed on behalf of the Creditors' Committee seeking $3,079,812.00 in fees and $32,031.06 in expenses.[110] Brown Rudnick failed to disclose the Jones-Freeman relationship in the application. Jones granted Brown Rudnick's request in full on December 30, 2020.[111]

92.    On March 26, 2021, Brown Rudnick filed its second and final fee application seeking an aggregate $12,000,841.50 in fees and $468,989.48 in expenses.[112] Again, Brown Rudnick failed to disclose the Jones-Freeman relationship in the application, despite having known of

---

[107] *Id.* ECF No. 3303.

[108] *Id.* ECF No. 3509.

[109] *4E Brands*, No. 22-50009, ECF No. 526 at 2.

[110] *Chesapeake*, No. 20-33233, ECF No. 1877.

[111] *Id.* ECF No. 2683.

[112] *Id.* ECF No. 3334.

the relationship the entirety of the proceeding. Jones granted Brown Rudnick's request in full on April 20, 2021.[113]

### XIII. Jones confirms the unlawful plan that awards a 200+% recovery to Class 4 at a cost of nearly $2 billion to Classes 5 and 6.

93. On January 16, 2021, Jones entered an order confirming the plan.[114] Jones noted Class 6 voted to reject the plan;[115] hardly surprising since it received a 4% recovery relative to an unlawful 200+% for Class 4. Nevertheless, Jones wrongfully concluded, without explanation, that "the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes[.]"[116] Jones also failed to address the fact that Class 5 was coerced into accepting the plan by a rights offering for new post-confirmation equity interests, but only if Class 5 participants voted for the plan.[117] Of course, no class was informed ahead of the vote that Jones and Freeman were in an intimate relationship or of any other aspect of their conspiracy with Jackson Walker and Kirkland.

94. As part of the confirmation order, Jones approved the consortium's sweeping, self-serving releases and exculpation provisions.[118] Additionally, their confirmation order was appeal-proofed because anyone contesting it would have met with a billion-dollar-plus bond requirement by Jones.[119] In light of this impossible bond and Stark's warning about Jones,

---

[113] *Id.* ECF No. 3517.

[114] *Id.* ECF No. 2915.

[115] *Id.* ECF No. 2915 ¶ 15.

[116] *Id.* ECF No. 2915 ¶ 60.

[117] *Id.* ECF No. 210 ¶ 114 (citing Supplemental Disclosure to Second Lien Notes, ECF No. 1930, pp. 1–2).

[118] *Id.* ECF No. 2915 ¶ 90.

[119] *See supra* n. 7.

there was no viable path for an appeal, particularly when Plaintiff was unaware of the source of the collusion—i.e., the Jones-Freeman relationship.

### XIV.   Jones finally admits to the intimate relationship with Freeman.

95.    In October 2023, Jones was forced to admit his intimate relationship with Freeman and that he has shared a home with her for years.[120] Remarkably, he maintained he had no duty to disclose because the couple was unmarried and, according to him, no economic benefit flowed to him.[121] In fact, while Jones was awarding Freeman fees, she was sharing household expenses. According to Jones, he and Freeman agreed years before that she would never appear in his courtroom.[122] This too was fiction. Freeman billed for appearances before him.[123] Ultimately, Jones felt there was no need to disclose because, in his words, "I just simply think I'm entitled to a certain degree of privacy."[124]

---

[120] Alexander Gladstone & Andrew Scurria, Bankruptcy Judge Jones Named in Lawsuit Over Romantic Relationship with Local Lawyer, Wall Street Journal Pro, (Oct. 7, 2023), accessible at https://www.wsj.com/articles/bankruptcy-judge-jones-named-in-a-lawsuit-over-romantic-relationship-with-local-lawyer-71df2c00?msockid=3e5b15acd8be600e191b00b7d91561ac (last visited Jan. 14, 2026).

[121] Id.

[122] Id.

[123] See, e.g., In re Bouchard Transp. Co., 20-34682, ECF No. 686 at p. 51 of PDF (Freeman billing for "attend[ing] the status conference" on November 17, 2020), at p. 69 of PDF (Freeman billing for "attend[ing] the sale hearing" on December 2, 2020).

[124] Id.

### XV.    Judge Jones resigns after the Fifth Circuit finds "probable cause to believe [he] engaged in misconduct[.]"

96.    On October 13, 2023, Judge Priscilla Richman of the Fifth Circuit entered a written order identifying a complaint against Jones.[125] Judge Richman found "probable cause to believe that misconduct by Jones has occurred."[126]

97.    Judge Richman observed that "Judge Jones is in an intimate relationship with Elizabeth Freeman. It appears that they have cohabited (living in the same house or home) since approximately 2017."[127] She further recognized that Jones had awarded substantial attorneys' fees payable to Jackson Walker for services performed by Freeman.[128] Even in cases in which it does not appear Freeman provided legal services or advice, "there is a reasonable probability that Elizabeth Freeman, as a partner in that firm, obtained a financial benefit from, or had a financial interest in, fees approved by Judge Jones.[129]

98.    Judge Richman disagreed that disclosure was unnecessary because Jones and Freeman were unmarried. Considerations for recusal "applicable to a judge's spouse should also be considered with respect to a person other than a spouse with whom the judge maintains both a household and an intimate relationship."[130]

---

[125] Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, Southern District of Texas, Under the Judicial Improvement Act of 2002, Complaint No. 05-24-90002 (5th Cir., Oct. 13, 2023) at 1.

[126] *Id.*

[127] *Id.*

[128] *Id.* at 2.

[129] *Id.*

[130] *Id.* at 4 (citing Commentary to Canon 3C of the Code of Conduct for United States).

99.    On October 15, 2023, two days after the Fifth Circuit's written order finding probable cause of misconduct, Judge Jones submitted his resignation, effective November 15, 2023.

### XVI.    The U.S. Trustee files a Rule 60(b) motion.

100.    On November 3, 2023, the U.S. Trustee filed a Rule 60(b) motion to claw back the $912,742 fees awarded by Jones to Jackson Walker.[131] Of note, the motion does not seek to return fees from Kirkland, nor does it seek damages from Jackson Walker, Kirkland, Jones, Freeman, or Brown Rudnick.

### XVII.    Defendants failed to satisfy their obligations to disclose the Jones-Freeman relationship and disqualify Judge.

101.    The bankruptcy rules provide that a "bankruptcy judge shall be governed by 28 U.S.C. § 455[.]" Fed. R. Bankr. P. 5004. Under Section 455(a), a judge shall disqualify himself "in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. §455(a); *see also* Code of Conduct for United States Judges, Cannon 3(C)(1). Meanwhile, section 455(b) mandates that a judge "shall . . . disqualify himself" if the judge's "spouse . . . its acting as a lawyer in the proceeding" or has "an interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(5)(ii), (iii).

102.    Both subsections (a) and (b) required disqualification. It goes without saying that Jones' impartiality would reasonably be questioned with his live-in girlfriend and her firm serving as counsel in the mediation. Further, Freeman is the equivalent of a spouse for purposes of judicial disqualification. For the entirety of the Chesapeake bankruptcy, Freeman was living with Judge Jones in a house they jointly owned and had an ongoing romantic relationship with him. As the Fifth Circuit observed, "[r]ecusal considerations applicable to

---

[131] *Chesapeake*, No. 22-33233, ECF No. 4514.

a judge's spouse should also be considered with respect to a person other than a spouse with whom the judge maintains both a household and an intimate relationship." *See also Conflicts Arising Out of a Lawyer's Personal Relationship with Opposing Counsel,* ABA Comm. On Ethics & Pro. Resp., Formal Op. 494 (July 9, 2020).

103.    All Defendant were required to disclose the Jones-Freeman relationship. Bankruptcy Rule 2014 and the fiduciary duties of estate counsel required their disclosure of any facts relevant to the bankruptcy court's determination of eligibility to be retained under 28 U.S.C. § 327. Likewise, the Texas Disciplinary Rules of Professional Conduct, applicable under the Southern District's Local Rules, required their utmost duty of candor.

104.    As described herein, including at paragraphs 16–18 and 75–85, which are incorporated by reference herein, these proceedings and malfeasance by Defendants caused Plaintiff and others similarly situated significant damages.

## STANDING AND MOTION FOR DERIVATIVE STANDING

105.    Plaintiff has both Article III and prudential standing. For Article III purposes, Plaintiff suffered injuries in fact that are fairly traceable to Defendants' misconduct and redressable by a favorable court decision. Plaintiff owned bonds issued by Chesapeake at face values that represented debt owed by Chesapeake to Plaintiff and other bondholders at an expected rate of return and maturity date. As described in paragraphs 16–18 and 75–85, the consortium's scheme to use the Jones-Freeman relationship to collect largely unopposed professional fees while paying bonuses to executives immediately before filing Chapter 11 bankruptcy and unlawfully enriching institutional creditors with whom they frequently engaged caused Plaintiff to lose at least $64 million in connection with their Chesapeake bonds, and caused Classes 5 and 6 to lose nearly $2 billion. Plaintiff and other bondholders were also harmed

because Kirkland, Jackson Walker, and Freeman unlawfully collected attorneys' fees expenses from Jones, which depleted the bankruptcy estate by more than $24 million, plus a $12.5 million retainer Kirkland took pre-petition. Brown Rudnick collected roughly $12.4 million in fees and expenses. Plaintiff seeks judgment from this Court redressing these damages.

106.    Plaintiff also has prudential standing. Plaintiff has personal, direct claims that belong to EJS and not the Chesapeake estate, post-effective date debtors, and/or successors-in-interest. *See In re Bernard L. Madoff Inv. Sec., LLC*, 2013 U.S. Dist. LEXIS 143956, *17-18 (S.D.N.Y. Sept. 30, 2013) ("[a] creditor's claim is non-derivative only if some direct legal obligation flowed from the defendants to the creditor") (citing *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988) (holding creditor's claims against officers of bankrupt corporation were not derivative since officers' fraudulent conduct directly caused creditor harm); *Medkser v. Feingold*, 307 Fed. Appx. 262, 265 (11th Cir. 2008) (holding claims alleging "direct injuries sustained by . . . plaintiffs" as a result of "intentional misrepresentations" were non-derivative)); *see also In re Gen. Homes Corp.*, 181 B.R. 870, 882 (Bankr. S.D. Tex. 1994) ("[t]he Committee's counsel, as well, has of course *a fiduciary relation to all unsecured creditors, not just Committee members*") (emphasis added). As described herein, Brown Rudnick's breaches of fiduciary duties to the Creditor's Committee and individual creditors like Plaintiff substantially diminished the value of Plaintiff's interests. Furthermore, Plaintiff's claims for aiding and abetting Brown Rudnick in its breach of fiduciary duty and unjust enrichment, among others, involve direct harm to EJS and are not derivative of claims belonging to the bankruptcy estate. Additionally, Plaintiff assert claims for losses that arose in the context of

the bankruptcy, but which are direct (and non-derivative of the estate) because they are part of a larger fraudulent scheme outside any single bankruptcy.

107.    To the extent any of the Plaintiff's claims or damages can be considered derivative, Plaintiff intend to move for special appointment and/or derivative standing to assert claims against these Defendants on behalf of the Chesapeake estate, post-effective-date debtors and/or successor entities. *See Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988); *In re Cooper*, 405 B.R. 801, 809 (Bankr. N.D. Tex. 2009). Plaintiff's claims are colorable. Further, the entity which might have brought the claims asserted by Plaintiff—the Creditor's Committee—no longer exists. The Creditors' Committee has been dissolved with two exceptions, neither of which is applicable. Indeed, counsel for the Creditors' Committee acknowledged as much when he admitted in an email to EJS's corporate contact Sofio on September 14, 2021, that "I am not counsel of record for anyone any more…." Even if the Committee were still active, it is deeply conflicted. As noted, the Committee was represented by Brown Rudnick through partner Stark. Stark failed to adequately advance or advocate for Plaintiff's proposed lawful and superior plans that would have avoided the 200+% windfall recovery to Class 4 at the expense of Classes 5 and 6. By his own admission, he knew of the Jones-Freeman relationship. Despite his fiduciary obligations to the Creditor's Committee and the creditors themselves, he did not disclose the Jones-Freeman relationship and did not advocate in support of Plaintiff's alternative plan because he knew there would be negative consequences for himself and his firm.

108.    In light of this Court's prior orders withdrawing the reference to bankruptcy court for matters pertaining to the Jones-Freeman relationship, Plaintiff intends to make his request for special appointment and/or derivative directly to this Court in the first instance.

109.    Since the only one who might have brought the claims is no longer a viable entity and in fact would never bring the claims even if it were, Plaintiff specifically intends to propose that this Court appoint Joe Sofio as a Limited Special Administrator or Limited Litigation Trustee to prosecute this Complaint against Defendants on behalf of Chesapeake.

110.    Although more background material will be provided in connection with the forthcoming motion to appoint and/or motion for derivative standing, Mr. Sofio has over twenty years of experience in accounting and finance, including various roles at large CPA and Wall Street firms. For the past 13 years, he has served as an accountant for EJS and has extensive experience with investments and debt involving distressed entities like those entering, navigating, and emerging from bankruptcy.

111.    To the extent Jackson Walker, Kirkland, Freeman, Jones, Brown Rudnick, or any other defendant or potential defendant may claim to be protected by exculpation, release, injunction, or other bars to liability, the same should be and are void as a result of the permeating fraud or abuse of process perpetuated by Defendants in the enactment of such provisions. Likewise, to the extent Defendants argue Plaintiff or any group of creditors approved of the plan or failed to object in any way, Defendants failed to disclose the intimate relationship between Jones and Freeman, depriving Plaintiff and everyone else interested in the bankruptcy from lodging meaningful objections as to the source of the collusion.

## CLASS ACTION ALLEGATIONS

112.    To the extent this Court grants Plaintiff standing to pursue claims on behalf of the Chesapeake estate or successor entities (by special appointment or derivatively), Plaintiff's

damages may be adequately redressed and it may be unnecessary for Plaintiff to pursue class certification.[132] However, Plaintiff herein preserves its rights to bring them.

113.    Plaintiff brings this Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated, consisting of all Class 5 and Class 6 creditors in the Chesapeake bankruptcy.

114.    This Action is properly maintainable as a class action.

115.    **Class Definition:** Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of themselves and a class of similarly situated persons, defined as follows:

> All persons or entities that were holders of Second Lien Note Claims (Class 5) and Unsecured Notes Claims (Class 6) at the time the Chesapeake bankruptcy plan was confirmed.

116.    Excluded from each Class are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

---

[132] Plaintiff is not seeking duplicate recoveries through alternative means but instead alternative avenues to the same relief.

117. **Numerosity:** The Class is so numerous that joinder of all members is impracticable. At the time of confirmation, there were at least hundreds of holders of Second Lien Note Claims (Class 5) and thousands of holders of Unsecured Notes Claims (Class 6) in the Chesapeake bankruptcy.

118. **Commonality and Predominance**: As to the Class, this action involves common questions of law and fact, which predominate over any questions affecting individual class members. Such common questions include:

(1) Whether Defendants owed a duty to disclose the relationship between Jones and Freeman;

(2) Whether Defendants negligently or intentionally concealed the Jones Freeman relationship in order to benefit themselves financially and/or reputationally in the bankruptcy industry;

(3) Whether Defendants' actions violated the RICO statute;

(4) Whether Defendants leveraged the concealed relationship to effect inequitable and prejudicial rulings and findings by Jones, resulting in financial or property harm to Plaintiff and other similarly situated creditors;

(5) Whether Defendants were unjustly enriched by wrongful, willful, malicious, or reckless conduct;

(6) Whether the Class of plaintiffs suffered damages proximately caused by Defendants' conduct;

(7) Whether Defendants breached their fiduciary duties to Plaintiff and other bondholders and/or creditors.

119.     Defendants have acted on grounds generally applicable to the Class with respect to the matters alleged in this Complaint, thereby making appropriate the relief sought in this Complaint with respect to the Class as a whole.

120.     **Typicality:** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subjected to the same allegedly unlawful and/or tortious conduct and damaged in the same way. Plaintiff and Class Members were each harmed by Defendants' wrongful concealment of the Jones-Freeman relationship, which was effectuated by Defendants for the purposes of enriching themselves financially and reputationally at the expense of Plaintiff and the Class Members.

121.     **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because it is a member of the Class and committed to pursuing this matter against Defendants to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff has retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

122.     **Predominance and Superiority:** Plaintiff anticipates that there will be no difficulty in the management of this litigation. Common issues, like those listed above, predominate over individual issues and maintaining this action as a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Also, the damages suffered by the vast majority of the Class are relatively small individually compared to the burden and expense required to individually litigate their claims against Defendants. Thus, individual litigation by class members to challenge Defendants' conduct would be impractical. Individual litigation would also strain the court system, create potential for inconsistent or contradictory judgments, increase delay and expense to all parties and the courts. Class action

litigation, however, presents fewer difficulties and provides benefits of a single adjudication, economies of scale, and uniform, comprehensive supervision by one court.

123.    **Risk of Prosecuting Separate Actions:** This case is appropriate for certification because prosecuting claims separately by individuals would create the risk of inconsistent, varying or contradictory adjudications, disparate and incompatible standards of conduct for Defendants, or would be dispositive of interests of members of the proposed Class.

124.    **Ascertainability:** The Class is defined by objective criteria, namely holders of Second Lien Note Claims (Class 5) and holders of Unsecured Notes Claims (Class 6) in the Chesapeake bankruptcy, and there is a feasible mechanism to identify and determine members of the Class.

125.    Plaintiff anticipates that there will be no difficulty in the management of this litigation. Common issues predominate over individual issues and maintaining this action as a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

<u>**CLAIMS FOR RELIEF**</u>

**COUNT I**
<u>**VIOLATION OF TITLE 18 US.C. § 1962(C):  CONDUCTING THE AFFAIRS OF THE ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY**</u>

*(Against Defendants Jones, Freeman, Kirkland and Jackson Walker)*

126.    Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

127.    Plaintiff asserts this claim against Defendants Jones, Freeman, Kirkland, and Jackson Walker ("RICO Defendants"), for violation of the RICO Act. Plaintiff specifically claims that the RICO Defendants violated 18 U.S.C. § 1962(c).

128.    From the point that Freeman joined Jackson Walker in 2018 and continuing through present, RICO Defendants did unlawfully, knowingly, and intentionally conduct and participate, directly and indirectly, in the conduct, management, and operation of the affairs of the Enterprise, which was engaged in and affected interstate commerce through a pattern of racketeering activity consisting of numerous acts of racketeering in the State of Texas and elsewhere, indictable under Title 18 U.S.C. § 1503 (obstruction of justice), § 1341 (mail fraud), § 1343 (wire fraud), § 152 (bankruptcy fraud) and § 1346 (honest services fraud).

129.    At all relevant times, RICO Defendants were "persons" within the meaning of 18 U.S.C. § 1962(c) and as defined by the statute. 18 U.S.C. § 1961 (defining a culpable "person" to include "an entity capable of holding a legal or beneficial interest in property"). RICO Defendants are each "persons" capable of holding legal or beneficial interests in property. *See* 18 U.S.C. § 1961.

130.    RICO Defendants constitute an association-in-fact enterprise with a clear common purpose, clear relationships between them and longevity sufficient to permit RICO Defendants to pursue the purpose of the Enterprise. Specifically, the purpose of the Enterprise was to increase the prestige and influence of each actor in bankruptcy practice, while enriching the RICO Defendants. This purpose was accomplished through multiple predicate acts, and without disclosing the Jones-Freeman intimate relationship to affected parties and creditors. The Enterprise carried out this purpose through bankruptcy fraud, mail fraud, wire fraud, obstruction of justice, and theft of honest services mail/wire fraud, corrupting bankruptcy practice in the Southern District of Texas in the process

131.    RICO Defendants are a group of business entities and individuals associated in fact ("the Enterprise"), which were engaged in, and the activities of which affected, interstate

commerce. As described herein, each RICO Defendant participated in the operation and management of the Enterprise. As such, RICO Defendants collectively have constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961 (4).

132.    RICO Defendants formed an ongoing structure of persons and entities that continually associated over an extended period of time for the shared purpose of enriching themselves and increasing their prestige and influence among bankruptcy lawyers and courts. RICO Defendants were in regular contact with one another via email, phone and in-person communications for the purposes of securing appointments in and making decisions regarding bankruptcy cases, getting cases filed in the "friendly" court of Jones or ensuring that he was appointed as mediator, and using Jones—either directly as the presiding judge or indirectly as the mediator—to obtain favorable results and lucrative fees in those cases.

133.    The Enterprise was organized in a manner amenable to consensual decision-making between the RICO Defendants and hierarchical decisions or recommendations handed down by Jones. Further, the Enterprise members followed a uniform course of conduct in always denying and concealing the Jones-Freeman relationship.

134.    As described throughout this complaint, each of the RICO Defendants has played some part in directing the Enterprise's affairs. Kirkland made numerous decisions exhibiting participation in the Enterprise including but not limited to seeking appointments as lead counsel; assisting in procuring the appointment of Jackson Walker and Freeman as local counsel; assisting in the scheme to ensure mega-bankruptcies landed in front of Jones; allowing Freeman to appear or work in cases before Jones without disclosing the Jones-Freeman relationship; filling pleadings and documents in Jones's court without disclosing the Jones-Freeman relationship; procuring improper, inequitable, and/or illegal results in

51

bankruptcy proceedings that favored RICO Defendants' preferred creditors at the expense of other bankruptcy participants; scheming to liquidate or take advantage of distressed entities and/or their creditors to ensure sufficient funds to pay professional fees and moving for and receiving millions of dollars in attorneys' fees without disclosing the Jones-Freeman relationship.

135.    Jackson Walker made numerous decisions exhibiting participation in the Enterprise including but not limited to deciding to hire Freeman and make her a partner; deciding to file cases in the Southern District of Texas; seeking appointments as local counsel; assisting in the scheme to ensure mega-bankruptcies either landed before Jones or that he was appointed as mediator to control the outcomes; allowing Freeman to appear in cases before Jones without disclosing the Jones-Freeman relationship; filing pleadings and documents in Jones's court or moving to appoint Jones mediator without disclosing the Jones-Freeman relationship; discussing with the other RICO Defendants possible disclosures of the Jones-Freeman relationship yet deciding to disclose nothing; procuring improper, inequitable, and/or illegal results in bankruptcy proceedings that favored RICO Defendants' preferred creditors at the expense of other bankruptcy participants; scheming to liquidate or take advantage of distressed entities and/or their creditors to ensure sufficient funds to pay professional fees; and moving for and receiving millions of dollars in attorneys' fees  (including fees for time billed by Freeman) without disclosing the Jones-Freeman relationship.

136.    Freeman made numerous decisions exhibiting participation in the Enterprise including but not limited to deciding to conceal her relationship with Jones from those interested in bankruptcies; assisting in the scheme to ensure mega-bankruptcies either landed before Jones or that he was appointed as mediator to control the outcomes; appearing and

billing in cases before Jones or in cases in which he was appointed mediator without disclosing the relationship; discussing with other RICO Defendants possible disclosures of the Jones-Freeman relationship yet deciding to disclose nothing; procuring improper, inequitable, and/or illegal results in bankruptcy proceedings that favored RICO Defendants' preferred creditors at the expense of other bankruptcy participants; and scheming to liquidate or take advantage of distressed entities and/or their creditors to ensure sufficient funds to pay professional fees.

137.    Jones made numerous decisions exhibiting participation in the Enterprise including but not limited to scheming to have mega-bankruptcies land before him either as judge or mediator in cases in which Kirkland, Freeman and Jackson Walker were involved; discussing possible disclosures of the Jones-Freeman relationship with other RICO Defendants yet deciding to disclose nothing in any bankruptcy; scheming to liquidate or take advantage of distressed entities and/or their creditors to ensure sufficient funds to pay professional fees, including fees that benefitted Jones; and concealing the Jones-Freeman relationship.

138.    In general, the Enterprise functioned as a continuing association-in-fact enterprise from at least 2018 through January 2025,[133] with Freeman only recently resigning as Wind Down Trustee in another ongoing bankruptcy, *GWG Holdings*—a position she gained and maintained through actions of members of the Enterprise.[134] Plaintiff alleges closed-ended

---

[133] While the existence of the Enterprise and the predicate acts overlap in time, "evidence establishing the enterprise and the pattern of racketeering may 'coalesce.'" *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 673–74 (5th Cir. 2015) (quoting *Boyle v. U.S.*, 556 U.S., 938, 947 (2009)); *see Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 738 (5th Cir. 2019) (same). "The linchpin of enterprise status is the continuity or ongoing nature of the association." *Allstate*, 802 F.3d at 673 (citing *Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1462 (5th Cir. 1991)).

[134] Freeman resigned from the position on November 5, 2025. However, the resignation was not effective until sixty days later, or Monday, January 5, 2026.

continuity based on a series of related predicates extending over a period of approximately seven years. During this time, the Enterprise members failed to formally disclose the Jones-Freeman relationship, schemed and cooperated with one another in keeping the relationship hidden from those interested in the bankruptcies, and benefitted from the actions of the Enterprise.

139.    The Enterprise consists of RICO Defendants Kirkland, Jones, Freeman, and Jackson Walker, who associated together in fact and carried out their common purpose by committing bankruptcy fraud, mail fraud, wire fraud, and theft of honest services mail/wire fraud.

140.    The Enterprise functioned to achieve the shared goals of increasing prestige and enriching RICO Defendants, which they accomplished both directly through approval of improper attorneys' fee awards and indirectly by elevating the status and demand for RICO Defendants Kirkland, Jackson Walker, and Freeman as bankruptcy attorneys, and by securing favorable bankruptcy court appointments and rulings—including tens of millions of dollars awarded as attorneys' fees—that were influenced by intimate relationships and self-interest and not based exclusively on the merits.

141.    RICO Defendants carried out the Enterprise through improper and unlawful acts including, but not limited to, the following:

  a.    securing the appointment of Kirkland, Jackson Walker, and Freeman, on bankruptcy cases before Jones or in cases in which Jones was appointed judicial mediator despite Jones having a personal and financial interest in the outcome of the case;

  b.    influencing the assignment of bankruptcy cases involving clients of Kirkland, Jackson Walker and Freeman to Jones, or having Jones appointed as judicial

mediator, despite Jones having a personal and financial interest in the outcome and handling of the case;

c.    failing to recuse, or seek the recusal or disqualification of Jones;

d.    failing to inform the court, creditors, opposing parties, and others of the intimate relationship between Jones and Freeman;

e.    deceiving the public, the judiciary, and bankruptcy creditors such as Plaintiff;

f.    withholding from Plaintiff and the public facts material to federal bankruptcy court decisions;

g.    defrauding creditors such as Plaintiff;

h.    influencing the orders issued in bankruptcy proceedings for the benefit of RICO Defendants (and clients or interests represented by RICO Defendants) and to the detriment of creditors such as Plaintiff;

i.    railroading any litigant who opposed the designs of the Enterprise;

j.    enhancing the status, reputation and demand for the services of RICO Defendants as bankruptcy professionals by obtaining favorable recommendations and rulings;

k.    profiting from the issuance of bankruptcy court rulings or recommendations favoring RICO Defendants that were issued in violation of law;

l.    securing large awards of fees without disclosing the Jones-Freeman relationship;

m.    shielding themselves from public, judicial and governmental scrutiny of wrongful acts;

n.   covering up the existence, purpose, and acts of the Enterprise by concealing, agreeing to conceal, failing to disclose, or denying the existence of an intimate relationship between Freeman and Jones; and

o.   covering up the existence, purpose, and acts of the Enterprise by failing to disclose the existence of the intimate relationship when disclosure was required.

142.   The Enterprise has pursued a course of conduct of deceit, misrepresentation, and conspiracy to deceive and defraud Plaintiff and the public, to withhold from Plaintiff and the public facts material to federal bankruptcy court decisions, and to influence, issue, and secure favorable bankruptcy court rulings in violation of law.

143.   The participants in this Enterprise have repeatedly and continuously engaged in a pattern of racketeering activities from at least 2018 through January 2025. During that time, Jones presided over at least 34 cases as judge and/or judicial mediator, in which RICO Defendants Kirkland, Jackson Walker, and Freeman were awarded millions of dollars in attorneys' fees under 11 U.S.C. § 330 and § 331. The compensation awards occurred while Freeman was both a Jackson Walker partner and living with Jones in an intimate relationship. This includes at least $1 million in fees billed by Freeman herself in 17 of those cases.

144.   The RICO Defendants' wrongful conduct in furtherance of the Enterprise, including the predicate acts described herein, was a direct and substantial cause of injury to Plaintiff. RICO Defendants intended to enrich themselves at the expense of the bankruptcy estate and creditors, such as Plaintiff. As a foreseeable result of RICO Defendants' conduct, Plaintiff was deprived of the opportunity to have bankruptcy proceedings determined on the merits free from the influence of interested parties. Plaintiff's damages, and those of the Chesapeake estate, are described in greater detail in paragraphs 16–18, 75–85, and 105. Additionally, as a

foreseeable result of RICO Defendants' conduct, Plaintiff's financial recovery as a bankruptcy creditor was reduced because the bankruptcy estate available to pay creditors, including Plaintiff, was diminished by structuring bankruptcy plan to benefit the RICO Defendants' preferred creditors to the detriment of other creditors in violation of the law, as well as by fees improperly awarded to Kirkland, Jackson Walker, and Freeman, despite Defendants not disclosing what Defendants knew at the time—that Jones and Freeman were in an intimate, domestic relationship. Moreover, as a foreseeable result of RICO Defendants' conduct, Plaintiff's financial recovery was reduced because RICO Defendants advocated and obtained approval by Jones of a bankruptcy plan that unlawfully enriched their preferred participants in the Chesapeake bankruptcy at the expense of the claims of Plaintiff and other creditors in violation of the law in order to satisfy RICO Defendants' objectives, including to obtain exorbitant professional fees and bolster professional reputation.

145.    At all relevant times, the Enterprise engaged in interstate commerce and the activities of the Enterprise affected interstate commerce. RICO Defendants' conduct in furtherance of the goals of the Enterprise included, but was not limited to, the following actions affecting interstate commerce:

(1) Out-of-state litigants appeared before Jones in cases over which he presided or in cases in which the Enterprise arranged for him to operate as a mediator.

(2) RICO Defendants represented out-of-state litigants, including Chesapeake, in bankruptcy proceedings and/or mediations before Jones.

(3) RICO Defendants caused the movement of money, including attorneys' fees and bankruptcy estate assets, from one state to another.

(4) RICO Defendants caused the transfer of services from one state to another.

146.    RICO Defendants' predicate acts were related to each other in that they involved the same pattern of using mail and wire communications to perpetuate the frauds that RICO Defendants were not interested parties in proceedings before Jones, that Jones was not subject to recusal or disqualification as judge in cases involving Defendants Jackson Walker and Freeman because of his intimate relationship with Freeman, and that positions, decisions, and funds were being awarded/approved to RICO Defendants Kirkland, Jackson Walker, and Freeman solely on the evidence and merits and not due to influence and self-dealing.

147.    As described in this Complaint, RICO Defendants' pattern of racketeering activity includes, but is not limited to, two or more violations of 18 U.S.C. § 1503 (obstruction of justice), § 1341 (mail fraud), § 1343 (wire fraud), § 152 (bankruptcy fraud) and § 1346 (honest services fraud).

**Violations of 18 U.S.C. § 1503 (Obstruction of Justice)**

148.    RICO Defendants have committed multiple instances of obstruction of justice in violation of 18 U.S.C. § 1503 which also constitutes racketeering activity within the meaning of 18 U.S. C. § 1961(1). Section 1503 prohibits any person from influencing, obstructing, impeding or intimidating any officer of a federal court in the discharge of his duty.

149.    RICO Defendants violated 18 U.S.C. § 1503(a) through acts of influence as set forth in this Complaint, which acts include, but are not limited to, the following:

    a.  Defendant Freeman used her intimate, personal relationship with Jones to influence favorable rulings or treatment in cases before Jones.

    b.  Defendants Kirkland and Jackson Walker used their knowledge of the relationship between Freeman and Jones to influence Jones to issue favorable rulings or proposals in cases before Jones.

    c.  Defendant Kirkland and Jackson Walker influenced Jones to make rulings or proposals that were favorable to Kirkland, Jackson Walker, their clients, and institutional creditors with whom they engaged frequently by offering lucrative payments and prestigious case assignments to Freeman that indirectly benefitted Jones.

    d.  RICO Defendants knowingly and deliberately concealed or failed to properly reveal the existence of an intimate, personal relationship between Freeman and Jones, thereby influencing officers of the bankruptcy court to permit the assignment of cases involving Defendants Kirkland, Freeman and/or Jackson Walker to Jones' court or to use Jones as a judicial mediator.

150.   Jones was an "officer in or of" a federal district court within the meaning of 18 U.S.C. § 1503 prohibiting influencing, impeding or intimidating any officer of a federal court in the discharge of his duty.

151.   These acts of influence obstructed justice and were at the heart of RICO Defendants' scheme to enrich and benefit themselves through the administrative process of ensuring Jones was in a place to influence or control appointments, decisions and rulings.

### Violations of 18 U.S.C. § 1341 (Mail Fraud)

152.   RICO Defendants have committed multiple instances of mail fraud in violation of 18 U.S.C. § 1341 which also constitutes racketeering activity within the meaning of 18 U.S. C. § 1961(1).

153.   For purpose of executing and attempting to execute their course of conduct, RICO Defendants would, and did, knowingly cause to be placed in any Post Office or authorized depository for mail, items to be sent and delivered by the U.S. Postal Services, including but

not limited to: (i) matters used to communicate with each other as co-conspirators and to further the goals of the Enterprise, (ii) matters used to communicate with clients and potential clients regarding the favorable outcomes Defendants Kirkland, Jackson Walker, and/or Freeman, have and would be able to obtain in proceedings or mediations before Jones, (iii) matters containing misrepresentations or omissions regarding the relationship that existed between Freeman and Jones, and (iv) invoices and billing materials reflecting fees sought and awarded to RICO Defendants.

154.    RICO Defendants' scheme to defraud was dependent upon information and documents passed by mail, in furtherance of Defendants' deceptive scheme, including, but not limited to, the following:

a. <u>Application to be Appointed Lead Counsel for Debtors and Debtors in Possession</u> prepared by Kirkland, signed by Chesapeake General Counsel, James R. Webb, and filed by Jackson Walker partner Cavenaugh in the U.S. Bankruptcy Court for the Southern District of Texas on July 16, 2020, in the Chesapeake bankruptcy.[135] The application included a declaration of disinterestedness signed by Kirkland partner Nash that failed to disclose the romantic relationship between the assigned judge and a partner with Kirkland's local counsel.[136] In fact, the declaration affirmatively listed Judge David Jones as a party against whom a conflict search was run.[137] Notably, portions of Nash's filed declaration were redacted and

---

[135] *Chesapeake*, Case No. 20-33233, ECF No. 372.

[136] *Id.* ECF No. 372.

[137] *Id.* ECF No. 372, schedule 1(e) (pdf p. 46).

Kirkland filed a separate Motion to Seal certain "Confidential Parties in Interest" related to Kirkland's application.[138] A supplemental declaration of Nash was filed on November 16, 2020, by Cavenaugh again failing to disclose the Jones-Freeman relationship.[139] Again, on December 17, 2020, Nash's second supplemental declaration was filed by Cavenaugh in support of Kirkland's application for employment, yet again failing to disclose the Jones-Freeman relationship.[140] Under the rules governing a bankruptcy proceeding a firm seeking to be employed by a debtor or debtor in possession must show that it is disinterested and must disclose all connections. Kirkland submitted declarations of disinterestedness disclosing conflicts of interest in the Firm's application for appointment; but did not disclose the intimate relationship between its local counsel, Jackson Walker's partner and the presiding bankruptcy judge. To the contrary, Kirkland affirmatively stated it was a disinterested party and represented that it had no potential conflicts or connection with bankruptcy judges in the Southern District of Texas.[141]

b.  <u>Application to be Appointed as Co-Counsel and Conflicts Counsel for Debtors and Debtors in Possession</u> prepared by Jackson Walker, signed by Chesapeake CFO, Domenic J. Dell'Osso, and filed by Jackson Walker partner Cavenaugh in the U.S. Bankruptcy Court for the Southern District of Texas on July 16, 2020, in the

---

[138] *Id.* ECF No. 372, schedule 1(e) (pdf. p. 17); *Id.* at ECF No. 381.

[139] *Id.* ECF No. 1834.

[140] *Id.* ECF No. 2535.

[141] *See e.g., id.* ECF No. 372, schedule 1(e) (pdf p. 46).

Chesapeake bankruptcy.[142] With its application, Jackson Walker submitted a declaration of disinterestedness signed by partner Cavenaugh disclosing conflicts of interest in the firm's application for appointment, but did not disclose the intimate Jones-Freeman relationship.[143] Under the rules governing a bankruptcy proceeding, a firm seeking to be employed by a debtor or debtor in possession must show that it is disinterested and must disclose all connections. Jackson Walker through its partners deliberately misled the Court and bankruptcy participants about its connection with the assigned judge.

c.  <u>Kirkland's Applications for Attorneys' Fees</u> filed on January 26 and March 26, 2021, by Cavenaugh on behalf of Kirkland in the Chesapeake bankruptcy. The applications requested an aggregate $23,448,619.50 in fees and $490,310.70 in expenses.[144] The application did not disclose the Jones-Freeman intimate relationship and did not trigger Kirkland to amend its declaration.

d.  <u>Jackson Walker's Applications for Attorneys' Fees</u> filed on November 25, 2020 and March 24, 2021, by Cavenaugh in the Chesapeake bankruptcy.[145] The applications requested an aggregate $912,742.00 in fees and $21,275.94 in expenses, including $192,257.50 in fees billed by Freeman for, *inter alia*, numerous appearances before Jones (including the 10+ day confirmation hearing) and a

---

[142] *Id*. ECF No. 370

[143] *Id*.

[144] *Id*. ECF No. 2977, 3333.

[145] *Id*. ECF Nos. 1928,

vague reference to conferring "with the court."[146] The application did not disclose the Jones-Freeman intimate relationship and did not trigger Jackson Walker to amend its declaration.

e. Proposed Plan filed on September 11, 2020, by Jackson Walker and Kirkland through Cavenaugh.[147] The proposed plan, and subsequent amendments and efforts to have the final plan approved, made no disclosure of the Jones-Freeman relationship.

155.    These mail communications were part and parcel of RICO Defendants' scheme to defraud Plaintiff and others interested in the Chesapeake bankruptcy and benefit themselves through the issuance of rulings from Jones or influenced by Jones as mediator that favored his romantic and domestic partner, Freeman, as well as Kirkland and Jackson Walker.

### Violations of 18 U.S.C. § 1343 (Wire Fraud)

156.    RICO Defendants committed multiple instances of wire fraud in violation of 18 U.S.C. § 1343 which also constitutes racketeering activity within the meaning of 18 U.S.C. § 1961(1).

157.    For purpose of executing and attempting to execute their scheme to defraud creditors including Plaintiff, through material deceptions, RICO Defendants knowingly transmitted and caused to be transmitted in interstate commerce by means of wire "transmissions" communications including but not limited to: (i) emails and phone calls used to communicate with each other as co-conspirators and to further the goals of the Enterprise, (ii) emails and calls used to communicate with clients and potential clients regarding the favorable outcomes

---

[146] *Id.* ECF Nos. 1928, 3303 at pdf p. 84.

[147] *Id.* ECF No. 1150.

RICO Defendants have and would be able to obtain in proceedings and/or mediations before Jones, (iii) electronic filings of documents containing misrepresentations or omissions regarding the relationship that existed between Freeman and Jones, and (iv) electronic filings of invoices and billing materials reflecting attorneys' fees or other professional fees sought by and awarded to RICO Defendants.

158.    RICO Defendants' scheme to defraud was dependent upon information and documents passed by wire in furtherance of RICO Defendants' deceptive scheme, including, but not limited to, the information and documents identified in paragraph 154 (a)–(e), which are incorporated herein by reference.

159.    These wire communications were part and parcel of RICO Defendants' scheme to defraud Plaintiff and benefit themselves through the issuance of improper rulings from Jones through the issuance of rulings from Jones or influenced by Jones as mediator that favored his romantic partner, Freeman, Kirkland, Jackson Walker, as well as institutional creditors with whom they regularly engaged.

**Violations of 18 U.S.C. § 1346 (Honest Services Mail and Wire Fraud)**

160.    RICO Defendants' scheme to defraud was designed and intended to deprive Plaintiff, creditors and others interested in the Chesapeake bankruptcy and other bankruptcies, and the public of the intangible right of honest services in violation of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud) and § 1346 (honest services fraud). Plaintiff and all parties affected by the Chesapeake bankruptcy were entitled to honest services from the attorneys representing the debtor and debtor-in-possession and the judge presiding over the case.

161.    RICO Defendants leveraged the intimate relationship between Jones and Freeman for personal gain and advantage while depriving Plaintiff, bankruptcy participants, and the public

of honest services. Defendants Kirkland, Jackson Walker, and Freeman benefited directly or indirectly by receiving financial compensation, enhanced status as bankruptcy attorneys, and favorable rulings for their clients and/or institutional bankruptcy creditors with whom they regularly engaged due to the involvement of Jones' intimate partner, Freeman. Defendant Jones, in turn, benefitted indirectly from the financial payments and enhanced opportunities afforded to Freeman by Kirkland and Jackson Walker because of her influence in proceedings in his Court.

162.    RICO Defendants' repeated representations of disinterestedness and failure to disclose the intimate Jones-Freeman relationship were material, false representations made as part of their scheme. Indeed, "[l]itigants in all of our courts are entitled to expect that the rules will be followed, the required disclosures will be made, and that the court's decisions will be based on a record that contains all the information applicable law and regulations require."[148]

163.    RICO Defendants' unlawful practices are actionable, particularly where they owed a fiduciary duty to Plaintiff and other bondholders/creditors, among others. As attorneys for the debtor-in-possession, Kirkland, Freeman, and Jackson Walker owed a fiduciary duty to the bankruptcy estate and to bondholders/creditors of the bankruptcy estate, including Plaintiff. Jones owed a fiduciary duty to the public and to the litigants whom he impacted by procuring or effecting (with Kirkland, Jackson Walker and Freeman) his assignment to particular cases, including but not limited to a duty to reveal conflicts of interest with litigants and/or their counsel, a duty to avoid self-dealing, including the duty to refrain from dealings

---

[148] *Alix v. McKinsey & Co.*, 23 F.4th 196, 204 (2d Cir. 2022) (denying Rule 12(b)(6) motion to dismiss against RICO/bankruptcy fraud allegation concerning fraudulent disclosure statement).

benefitting people (such as Freeman) closely identified with the fiduciary, a duty to disqualify himself in a proceeding where his live-in, intimate partner was a lawyer in the case or where his impartiality might reasonably be questioned.

164.    RICO Defendants willfully participated in the scheme to deprive Plaintiff, those interested in bankruptcies, and the public of the intangible right of honest services through multiple acts of mail fraud and wire fraud as outlined above. RICO Defendants' acts of honest services fraud were committed by use of the mail and wires as previously alleged.

### Violations of 18 U.S.C. § 152 (Bankruptcy Fraud)

165.    RICO Defendants have committed multiple instances of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2), 152(3) and 152(6) each of which also constitute racketeering activity within the meaning of 18 U.S. C. § 1961(1).

166.    Under 18 U.S.C. § 152(2) a defendant commits bankruptcy fraud if he or she "knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11." RICO Defendants committed acts of bankruptcy fraud by knowingly and fraudulently declaring they were not interested parties in cases before Jones despite awareness of the relationship between Freeman and Jones. For example, Kirkland submitted a July 16, 2020 declaration of disinterestedness in the Chesapeake bankruptcy stating it was a disinterested party, failing to disclose the Jones-Freeman relationship, and in fact affirmatively representing the absence of any conflict with bankruptcy judges in the Southern District of Texas. Jackson Walker also filed a declaration of disinterestedness failing to disclose the Jones-Freeman relationship.

167.    Defendants Kirkland, Jackson Walker and Freeman also committed acts of bankruptcy fraud by continuing to file pleadings and documents, including multiple

applications for attorneys' fees, and by continuing to engage in proceedings before Jones, without disclosing the relationship and in fact fraudulently representing the absence of any conflict with bankruptcy judges in the Southern District of Texas despite awareness of the relationship between Freeman and Jones.

168.    Jones committed acts of bankruptcy fraud by explicitly or implicitly representing or acknowledging that Kirkland, Jackson Walker and Freeman were disinterested parties despite knowledge of the relationship between himself and Freeman. Jones engaged in the non-judicial acts of orchestrating with Kirkland, Jackson Walker and Freeman for him to be assigned certain cases so that he could ensure lucrative fees to Kirkland, Jackson Walker and Freeman, which benefitted Jones indirectly.

169.    Under 18 U.S.C. § 152(6) a defendant commits bankruptcy fraud if he or she "knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any cause under title 11." RICO Defendants committed acts of bankruptcy fraud by Jones knowingly giving Kirkland, Jackson Walker and Freeman favorable treatment overseeing implementation of bankruptcy plans that provided benefits to Kirkland, Jackson Walker and Freeman, their clients, and institutional creditors with whom they frequently engaged, all with Jones, Freeman, and Jackson Walker all choosing not to make required disclosures concerning the relationship. Kirkland and Jackson Walker knowingly provided Jones remuneration indirectly through the retention of Jackosn Walker as local counsel and compensation to Freeman while he continued to conceal the intimate, live-in relationship with Freeman that would prevent Jackson Walker from continuing to be retained as counsel and from retaining any attorneys' fees in the case.

170.    As described in greater detail in paragraphs16–18, 75–85, and 105, RICO Defendants' racketeering activities were the substantial and proximate cause of damages to Plaintiff and to those similarly situated. Further, because RICO Defendants' conduct targeted the federal judiciary and the bankruptcy process in particular, the judiciary's responsibility to superintend the integrity of the bankruptcy process lessens the plaintiff's burden to show a direct injury, at least at the pleading stage.

171.    Plaintiff is entitled to and respectfully request (1) three times actual damages, (2) attorneys' fees, (3) pre-judgment and post-judgment interest, (4) costs, (5) disgorgement of profits and forfeiture of fees, (6) nominal damages, (7) any other damages permitted pursuant to 18 U.S.C. § 1964(c), and (8) such other and further relief as may be just and appropriate.

### COUNT II
### CONSPIRACY TO ENGAGE IN A PATTERN OF RACKETEERING ACTIVITY IN VIOLATION OF TITLE 18 US.C. § 1962(D)

*(Against Defendants Jones, Freeman, Kirkland, and Jackson Walker)*

172.    Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

173.    RICO Defendants conspired and agreed, either directly or indirectly, to commit a substantive offense under 18 U.S.C. § 1962(c) as described above.

174.    RICO Defendants acted in agreement by participating, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1962(b) and (d).

175.    From approximately 2018 through present, RICO Defendants cooperated jointly and severally in the commission of two or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1) (A) and (B), in violation of 18 U.S.C. § 1962(d) as previously set forth in Count I.

RICO Defendants committed these predicate acts as part of a continuous course of conduct that was a pattern of racketeering activities. Further, RICO Defendants were in regular contact with one another via email, phone and in-person communications for the purposes of securing appointments in and making decisions regarding bankruptcy cases, getting cases filed in Jones' "friendly" court or appearing before Jones as a specifically requested mediator, and obtaining favorable decisions, recommendations, and lucrative appointments and fees in those cases.

176. RICO Defendants' conspiracy to engage in racketeering activity through the predicate acts set forth in Count I were the substantial and proximate cause of damage to Plaintiff. RICO Defendants intended to enrich themselves at the expense of the bankruptcy estate and bondholders/creditors such as Plaintiff. As a foreseeable result of RICO Defendants' conduct, Plaintiff was deprived of the opportunity to have bankruptcy proceedings determined on the merits free from the influence of interested parties. Additionally, as a foreseeable result of RICO Defendants' conduct, Plaintiff's financial recovery was reduced because the bankruptcy estate available to pay creditors, including Plaintiff, was diminished by the fees improperly awarded to Kirkland, Jackson Walker and Freeman and the refusal to consider or implement alternative plans that were in the best interest of the debtors and/or creditors, but were adverse to the RICO Defendants' interests. As detailed above, the foregoing conspiracy caused a loss in value of Plaintiff's and other creditor's notes and bonds as described *supra* in paragraphs 16–18, 75–85, and 105.

177. Plaintiff is entitled to and respectfully requests (1) three times actual damages, (2) attorneys' fees, (3) pre-judgment and post-judgment interest, (4) costs, and (5) any other damages permitted pursuant to 18 U.S.C. § 1964(c), (6) disgorgement of profits and forfeiture

of fees, (7) nominal damages, and (8) such other and further relief as may be just and appropriate.

### COUNT III
### COMMON LAW FRAUD

*(Against Defendants Jones, Freeman, Kirkland, and Jackson Walker)*

178.    Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

179.    Plaintiff alleges common-law fraud against Defendants Jones, Freeman, Kirkland, and Jackson Walker ("Fraud Defendants").

180.    The details of Fraud Defendants' material misrepresentations are set forth in more detail in Count I and the preceding sections, which are incorporated herein by reference. Defendants Jackson Walker and Freeman committed common-law fraud by knowingly declaring that Jackson Walker was not an interested party and had no conflicts with bankruptcy judges of the Southern District of Texas in cases or mediations before Jones and/or failing to disclose the relationship in the declarations of disinterestedness.

181.    For example, Kirkland submitted declarations of disinterestedness from its partner Nash in the Chesapeake bankruptcy, filed by Jackson Walker partner Cavenaugh, purporting to disclose conflicts of interest in the Firm's application for appointment without disclosing the intimate relationship between their local counsel the judge overseeing both bankruptcy cases.

182.    Further, Jackson Walker submitted declarations of disinterestedness in the Chesapeake bankruptcy, filed by Jackson Walker partner Cavenaugh, purporting to disclose conflicts of interest in the Firm's application for appointment without disclosing the intimate relationship between their partner and a bankruptcy judge in the Southern District of Texas. Freeman, a

partner at Jackson Walker, likewise committed fraud by failing to disclose the relationship between herself and Jones in any of the foregoing documents.

183.    These were all material representations in that the disclosures were required to secure and retain appointments. Further, neither Kirkland, Freeman nor Jackson Walker were entitled to compensation in light of the undisclosed conflict which represented a breach of their fiduciary duties. At the time the representations were made, Kirkland, Jackson Walker, and of course Freeman and Jones, admittedly knew about the intimate, domestic relationship but nevertheless falsely held themselves out as disinterested and without conflict with respect to bankruptcy judges in the Southern District of Texas. Kirkland, Jackson Walker and Freeman made the representations with the intent that all parties to the bankruptcy, including Plaintiff, would rely on them and not challenge their appointments, their awards of attorneys' fees, or the bankruptcy plan in light of the ongoing collusion. All parties unaware of the Jones-Freeman relationship in the Chesapeake bankruptcy, including Plaintiff, relied on the false representation, and thereby suffered injury by, among other things, Kirkland, Jackson Walker and Freeman securing appointment and receiving attorneys' fees from the bankruptcy estate, loss resulting from waste and false valuations of Chesapeake during the bankruptcy, all without disclosure of the intimate Jones-Freeman relationship.

184.    Jones committed fraud through his non-judicial acts of scheming with Kirkland, Jackson Walker and Freeman for him to be assigned the Chesapeake bankruptcy.

185.    Jones created and/or perpetuated the inference that he was disinterested to serve as a judge with the intent that all parties to the bankruptcy would rely on it and not challenge the assignment. All parties to the bankruptcy, including Plaintiff, relied on the false representation, and suffered injury when, among other things, Kirkland, Jackson Walker and Freeman were

appointed and awarded attorneys' fees from the bankruptcy estate. Additionally, all parties to the bankruptcy, including Plaintiff, relied on the false representation that the plan orchestrated by Defendants was not the result of collusion and fraud, and thereby suffered injury.

186.   Jones made these representations with the intent that all parties to the bankruptcy would rely on them and not discover the scheme to have him wrest control of the case. All parties to the bankruptcy, including Plaintiff, relied on these false representation, and thereby suffered injury by, among other things, Kirkland, Jackson Walker and Freeman securing appointment and receiving fees from the bankruptcy estate, and loss from waste, unlawful distributions, and false valuations in the Chesapeake bankruptcy, all without disclosure of the intimate Jones-Freeman relationship. Defendants' fraud caused a loss in value of Plaintiff's and other creditor's notes and bonds as described *supra* in paragraphs 16–18, 75–85, and 105.

187.   The foregoing misrepresentations were made willfully and with knowledge of their falsity when made. Alternatively, Fraud Defendants made these representations recklessly without any knowledge of the truth and as a positive assertion.

188.   Plaintiff is entitled to actual damages and exemplary damages based on Fraud Defendants' actions. Plaintiff also request disgorgement of profits and forfeiture of fees, nominal damages, and such other and further relief as may be just and appropriate.

## COUNT IV
## BREACH OF FIDUCIARY DUTY

*(Against All Defendants)*

189.   Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

190.   Plaintiff intends to bring this Count against Kirkland, Jackson Walker, Freeman, and Jones on behalf of the Chesapeake bankruptcy estate or successor entities either through

special appointment or derivative standing. Plaintiff also bring this Count against Brown Rudnick directly for its actions taken while serving as co-counsel for Creditors' Committee.

**As Against Kirkland, Jackson Walker, and Freeman**

191.    As attorneys for debtors-in-possession, Defendants Kirkland, Jackson Walker, and Freeman owed a fiduciary duty to the bankruptcy estate and to Plaintiff as a creditor/bondholder of the bankruptcy estate.

192.    Plaintiff, as a creditor and interested party to the bankruptcy estate, reposed confidence and trust in Defendants Kirkland, Jackson Walker, and Freeman as lead counsel, conflicts counsel and/or counsel for the debtor-in-possession, Jones as judge, and Brown Rudnick as counsel for the Creditors Committee. Plaintiff relied, directly or indirectly, on Defendants to carry out their function in a manner that enabled the fair resolution of bankruptcy proceedings.

193.    Counsel for a debtor in possession owed a fiduciary duty to the estate and to creditors of the estate that included, but was not limited to:

   a.  a duty to reveal known conflicts of interest with court professionals,

   b.  a duty to disclose acts of conversion, concealment, or misuse of estate property,

   c.  a duty to reveal matters having an adverse effect on the bankruptcy estate,

   d.  a duty to avoid actions that would wrongfully deplete the fund from which creditors are to be paid, and

   e.  a duty to avoid intentional wrongs.

194.    Defendants Kirkland, Jackson Walker, and Freeman knew or should have known that bondholders/creditors such as Plaintiff relied on their good-faith oversight and preservation

of the bankruptcy estate from which creditors were to be paid and to reveal any matters adversely impacting the fair, impartial handling of the bankruptcy estate.

195.    Plaintiff relied on the false representations of Defendants Kirkland, Jackson Walker, and Freeman as being disinterested parties in the bankruptcy proceedings. Plaintiff relied on the representations of Defendants Kirkland, Jackson Walker, and Freeman as operating in good faith and being free from conflict with the judge overseeing the case, and in Kirkland's, Jackson Walker's, and Freeman's representations of being lawfully entitled to fees paid from the bankruptcy estate, and that such fees were not the product of an undisclosed, intimate relationship between the petitioning attorney, her firm, co-counsel, and the judge. They further relied on the representation that the bankruptcy plan presented by Defendants Kirkland, Jackson Walker, and Freeman and approved by Jones was submitted and approved in good faith and was not the product of collusion.

**As Against Jones**

196.    Jones owed a fiduciary duty to the public and to interested parties in bankruptcies in cases like Chesapeake, where he conspired with Kirkland, Jackson Walker, and Freeman to affect the assignment of cases to his court. Jones owed a fiduciary duty to those interested in the bankruptcy proceedings not to manipulate the bankruptcy proceedings for the gain of his intimate, live-in partner, and indirectly for himself.

197.    Jones owed a fiduciary duty to the public and to the litigants whom he impacted by orchestrating (with Kirkland, Jackson Walker, and Freeman) the assignment of cases to his court, including but not limited to:

    a.  a duty of candor,

    b.  a duty to reveal conflicts of interest with litigants and/or their counsel,

c.  a duty of good faith and fair dealing,

d.  a duty of loyalty, which encompasses impartiality,

e.  a duty to avoid self-dealing, including the duty to refrain from dealings benefiting people (such as Freeman) closely identified with the fiduciary,

f.  a duty to disqualify himself, either as the presiding judge or mediator, in a proceeding where his live-in, intimate partner was a lawyer in the case or where his impartiality might reasonably be questioned,

g.  a duty to reveal matters having an adverse effect on the bankruptcy estate,

h.  a duty to avoid intentional wrongs.

198.    Jones knew or should have known that Plaintiff, as a bondholder/creditor of Chesapeake, relied on him to be free from influence or self-interest in the assignment of cases and the oversight of bankruptcy proceedings, to aid in the good-faith oversight and preservation of the bankruptcy estate from which creditors were to be paid, and to reveal any matters adversely impacting the fair and impartial adjudication of the bankruptcy estate.

199.    Plaintiff relied on Jones' implicit and explicit assurances that there were no undisclosed interested parties involved in the bankruptcy proceedings assigned to his court and that his recommendations and acts as both judicial administrator and as judge were taken in good faith and without a compromised relationship with one of the attorneys before him. Plaintiff relied on Jones' representations—implicit and explicit—of his disinterest.

**As Against Brown Rudnick**

200.    In the application to appoint Brown Rudnick as co-counsel to the Creditor Committee, the Committee outlined Brown Rudnick's obligations, including but not limited to "assisting and advising the Committee in its discussions with the Debtors and other parties-in-interest

regarding the overall administration of these cases;" "assisting and advising the Committee in its examination and analysis of the conduct of the Debtors' affairs;" "reviewing and analyzing . . . documents filed and to be filed with this Court by interested parties in these cases; advising the Committee as to the necessity, propriety, and impact of the foregoing upon these cases; and consenting or objecting to pleadings or orders on behalf of the Committee, as appropriate;" "coordinating the receipt and dissemination of information prepared by and received from the Debtors' professionals, as well as such information as may be received from professionals engaged by the Committee or other parties-in-interest in these cases;" "participating in such examinations of the Debtors and other witnesses as may be necessary in order to analyze and determine, among other things, the Debtors' assets and financial condition, whether the Debtors have made any avoidable transfers of property, or whether causes of action exist on behalf of the Debtors' estates;" "negotiating and, if necessary or advisable, formulating a plan of reorganization for the Debtors; and assisting the Committee generally in performing such other services as may be desirable or required for the discharge of the Committee's duties pursuant to Bankruptcy Code Section 1103."[149]

201.    As attorneys for the Creditor Committee, Brown Rudnick owed a fiduciary duty to the Creditor Committee as well as the creditors and bondholders represented by the Committee, including Plaintiff. This included a duty of loyalty, and a fiduciary duty to disclose known conflicts of interest involving court professionals and a duty to reveal matters having an adverse effect on the bondholders/creditors or bankruptcy estate. Brown Rudnick had a fiduciary duty to disclose to the Committee and the individual creditors represented by the

---

[149] *Chesapeake*, No. 20-33233, ECF No. 725 ¶ 7.

Committee that the presiding judge was in an intimate, live-in relationship with Freeman, a partner at Jackson Walker who represented the Debtor.

202.    Plaintiff, as a bondholder/creditor and interested party to the bankruptcy estate, reposed confidence and trust in Brown Rudnick as co-counsel for the Creditor's Committee. Plaintiff relied, directly or indirectly, on Brown Rudnick to carry out its function in a manner that enabled the fair and good faith resolution of bankruptcy proceedings.

203.    Brown Rudnick knew or should have known that bondholders/creditors such as Plaintiff relied on its good-faith representation of the Creditor's Committee and the interests of the bondholders and its implicit representation that Brown Rudnick was unaware of any disqualifying conflict between Jones, Freeman, Jackson Walker, and Kirkland. Upon information and belief, Defendant Brown Rudnick did not disclose the Jones-Freeman relationship to the constituents of the Creditor's Committee or any of the creditors or bondholders represented by the Committee.

204.    Plaintiff relied on Brown Rudnick's failure to disclose the conflict involving Jones as judge and Kirkland, Freeman and Jackson Walker, and further relied on Brown Rudnick's failure to disclose that these actors were not operating in good faith and free from conflict. Plaintiff further relied on Brown Rudnick's failure to disclose the Jones-Freeman relationship in connection with Kirkland's, Freeman's and Jackson Walker's representations of being lawfully entitled to fees paid from the bankruptcy estate (which reduced the estate that was available to pay bondholders/creditors such as Plaintiff), and that such fees were not the product of an undisclosed, intimate relationship between Freeman and the judge overseeing the case. Plaintiff further relied on Brown Rudnick's failure to disclose the Jones-Freeman relationship and its representation that it was acting in good faith and without knowledge of

the disqualifying conflict in connection with Brown Rudnick's decision not to advocate in favor of Plaintiff's alternative plan.

**As Against All Defendants**

205.   Defendants breached their fiduciary duties by acts including, but not limited to:

    a.   securing appointments of Kirkland, Freeman, and Jackson Walker as attorneys on bankruptcy cases, including Chesapeake, despite Jones as judge having a personal and financial interest in the outcome of the case and without updating previously filed disclosures;

    b.   providing false or misleading information for purposes of deceiving the public, the judiciary, and bankruptcy shareholders and creditors such as Plaintiff;

    c.   withholding from Plaintiff and the public facts material to federal bankruptcy court decisions;

    d.   Jones, Kirkland, Freeman, and Jackson Walker scheming to have particular bankruptcy cases assigned to Jones' court;

    e.   Jones failing to refuse to serve or recuse himself as judge;

    f.   defrauding creditors and shareholders such as Plaintiff;

    g.   influencing the orders issued in bankruptcy proceedings for the benefit of Defendants and to the detriment of bondholders/creditors such as Plaintiff;

    h.   enhancing the status, reputation, and demand for the services of Kirkland, Freeman and Jackson Walker as bankruptcy attorneys by securing rulings or results favorable to Kirkland, Freeman and Jackson Walker;

    i.   wrongfully depleting, wasting, falsely valuing, and misrepresenting the estate assets;

j.  assuming positions where their duties to Plaintiff were in conflict with Defendants' responsibilities to others or materially limited by Defendants' personal interests;

k.  failing to provide appropriate disclosures and transparency;

l.  profiting from the issuance of bankruptcy court rulings favoring Defendants,

m.  acting to benefit their own self-interest to the detriment of Plaintiff and other bondholders/creditors;

n.  shielding themselves from public, judicial and governmental scrutiny relating to the relationship between Freeman and Jones; and

o.  committing intentional wrongs.

206.    Defendants knew or should have known that creditors and bondholders, such as Plaintiff, would be harmed by Defendants' actions in breach of Defendants' fiduciary duties.

207.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Jones improperly presided over bankruptcy cases in which he was unquestionably disqualified to serve, Jackson Walker, Freeman, and Kirkland were awarded attorneys' fees on behalf of the debtor and Brown Rudnick collected fees on behalf of the Creditor's Committee which caused Plaintiff to suffer damages including but not limited to economic harm and monetary loss. As a foreseeable result of Defendants' conduct, Plaintiff's financial recovery was drastically reduced because the bankruptcy estate available to pay bondholders/creditors, including Plaintiff, was diminished by the fees improperly awarded to Kirkland, Jackson Walker and Freeman as debtor's counsel and by Brown Rudnick as counsel for the Creditor's Committee. Further, had Defendants disclosed the Jones-Freeman relationship, Plaintiff and other creditors could have moved to disqualify Jones, objected to Kirkland, Jackson Walker, and Freeman serving as debtor's counsel, and objected to the proposed plan as the product of

collusion between Jones, his live-in girlfriend, Freeman, Jackson Walker, and Kirkland. Further, as a foreseeable result of Defendants' conduct, the debtors' assets and operations were misrepresented, falsely valued, and manipulated to diminish Plaintiff's interests, none of which would have occurred had Defendants disclosed Freeman and Jones were in an intimate relationship and co-owned a home. As such, the foregoing conduct by Defendants caused a loss in value of Plaintiff's and other creditor's notes and bonds as described *supra* in paragraphs 16–18, 75–85, and 105.

208.    Plaintiff is entitled to and respectfully requests (1) compensatory damages, (2) punitive damages, (3) pre-judgment and post-judgment interest, (4) costs of suit, (5) disgorgement of profits and forfeiture of fees, (6) nominal damages, and (7) such other and further relief as may be just and appropriate.

## COUNT V
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

*(Against All Defendants)*

209.    Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

210.    At all times, each Defendant was aware of the fiduciary duties owed by each of the other Defendants to the debtors, creditors, and bondholders, including Plaintiff.

211.    Despite this knowledge, each Defendant was aided and abetted by the other Defendants in the breach of their fiduciary duties owed to the debtors, creditors, and bondholders, including Plaintiff.

212.    As a direct and proximate result of Defendants' wrongful acts and omissions, including concealing the intimate, live-in relationship between Jones and Freeman, Plaintiff suffered damages. In particular, Jones improperly orchestrated and presided over the

Chesapeake bankruptcy in which he was unquestionably disqualified to serve, while Kirkland, Jackson Walker, and Freeman were awarded attorneys' fees on behalf of the debtors and Brown Rudnick collected fees as counsel for the Creditor's Committee, which caused Plaintiff to suffer damages including but not limited to economic harm and monetary loss. As a foreseeable result of Defendants' conduct, Plaintiff's financial recovery was drastically reduced because the bankruptcy estate available to pay bondholders/creditors, including Plaintiff, was diminished by the fees improperly awarded to Kirkland, Jackson Walker and Freeman as debtor's counsel and collected by Brown Rudnick as Creditor's Committee counsel. Further, had Defendants disclosed the Jones-Freeman relationship, Plaintiff and other creditors could have moved to disqualify Jones, objected to Kirkland, Jackson Walker, and Freeman serving as debtor's counsel, and could have objected to the proposed plan as the product of collusion between Jones, his live-in girlfriend, Freeman, Jackson Walker, and Kirkland. Further, as a foreseeable result of Defendants' conduct, Plaintiff's interest in the bankruptcy estates were diminished by waste, false valuations, misrepresentations of the debtors' assets and operational capabilities, and unlawful distributions, none of which would have occurred had Defendants disclosed Freeman and Jones were in an intimate relationship and co-owned a home. As such, Defendants' conduct caused a loss in value of Plaintiff's and other creditor's notes and bonds as described *supra* in paragraphs 16–18, 75–85, and 105.

213.    Plaintiff is entitled to and respectfully requests (1) compensatory damages, (2) damages for emotional distress and mental anguish, (3) punitive damages, (4) pre- judgment and post-judgment interest, (5) costs of suit, (6) disgorgement of profits and forfeiture of fees, (7) nominal damages and (8) such other and further relief as may be just and appropriate.

## COUNT VI
## COMMON-LAW CIVIL CONSPIRACY

*(Against Jones, Freeman, Kirkland, and Jackson Walker)*

214.    Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

215.    Plaintiff alleges a civil conspiracy against Kirkland, Jackson Walker, Freeman, and Jones ("Conspiracy Defendants") in connection with orchestrating Jones' serving as presiding judge without disclosing the Jones-Freeman intimate relationship and while affirmatively representing disinterestedness. Jones conspired through administrative, non-judicial acts, including conferring with Kirkland, Jackson Walker, and/or Freeman on how to effect the assignment of the Chesapeake bankruptcy to him as presiding judge.

216.    Once Conspiracy Defendants succeeded in their scheme to have Jones assigned the Chesapeake bankruptcy, they perpetuated misrepresentations of the debtors' assets and operational capabilities to the detriment of creditors like Plaintiff and arranged for unlawful distributions to institutional creditors with whom they frequently engaged. Kirkland, Jackson Walker, and Freeman collected millions in attorneys' fees with Jones benefitting financially through Freeman, and without any Conspiracy Defendant ever disclosing the Jones-Freeman relationship.

217.    Conspiracy Defendants agreed to collect profit through the Jones-Freeman relationship by interjecting Jones into cases using his administrative role to accomplish the assignment of cases to his court to pursue their objectives (without ever disclosing the disqualifying conflict), with all Conspiracy Defendants profiting directly or indirectly from the arrangement. Conspiracy Defendants had a meeting of the mind on the object of the conspiracy—collecting millions in attorneys' fees and securing lucrative appointments; and

on the course of action—failing to disclose the Jones-Freeman intimate relationship and affirmatively representing disinterestedness.

218.   These misrepresentations, including but not limited to the declaration of disinterestedness, the Chesapeake bankruptcy plan that unlawfully distributed assets and perpetuated misrepresentations to the detriment of Plaintiff and other creditors, and subsequent pleadings and participation in proceeding made without amending the disclosures, are unlawful, overt acts.

219.   Conspiracy Defendants also committed civil conspiracy to breach their fiduciary duty to creditors including Plaintiff and other interested parties to the Chesapeake bankruptcy by agreeing not to disclose the intimate Jones-Freeman relationship and to affirmatively represent disinterestedness while collecting unlawful profit. Defendants took one or more unlawful acts, including filing fraudulent declarations of disinterestedness and failing to amend them, and filing motions for attorneys' fees, all without disclosing the intimate live-in relationship between the judge and a Jackson Walker partner.

220.   The bondholders/creditors, Plaintiff, and other interested parties to the Chesapeake bankruptcy suffered damages as a proximate result of the foregoing civil conspiracy, including but not limited to the improper appointment and award of attorneys' fees to Kirkland, Freeman, and Jackson Walker, which has reduced the valuations of the debtors and resulted in financial harm to Plaintiff and other creditors/bondholders, all without disclosure of the intimate, live-in relationship between the Jackson Walker partner and the judge. As such, the foregoing conspiracy caused a loss in value of Plaintiff's and other creditor's notes and bonds as described *supra* in paragraphs 16–18, 75–85, and 105.

221.    Plaintiff is entitled to and respectfully requests damages including (1) compensatory damages, (2) punitive damages, (3) pre-judgment and post-judgment interest, (4) costs of suit, (5) disgorgement of profits and forfeiture of fees, (6) nominal damages, (7) exemplary damages, and (8) such other and further relief as may be just and appropriate.

## COUNT VII
## UNJUST ENRICHMENT

*(Against All Defendants)*

222.    Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

223.    Defendants enriched themselves at the expense of the bankruptcy estate and bondholders/creditors of the Chesapeake bankruptcy such as Plaintiff. As a foreseeable result of Defendants' conduct, Plaintiff's recovery as a bondholder/creditor was reduced because the bankruptcy estate was diminished by the improper appointment and award of attorneys' fees to Kirkland, Freeman, Brown Rudnick, and Jackson Walker and loss from waste and misrepresentation of the debtors' values and operational capabilities.

224.    Kirkland, Jackson Walker, and Freeman used their positions as bankruptcy counsel for Chesapeake to engage in self-dealing and generally improper conduct and were enriched by such conduct. They received substantial fees, were able to retain valuable clients with promises of access to a friendly judge and enhanced their reputation as bankruptcy counsel because of their ability to manipulate the proceedings through the Jones-Freeman relationship. Brown Rudnick, despite its position as counsel for the Creditor's Committee, acquiesced to the knowing concealment of conflicts for the purpose of ensuring non-opposition to the award of its fees for serving in that position.

225.    Defendants' wrongful and fraudulent conduct, as alleged in this Complaint, caused Defendants to become unjustly enriched and receive benefits that otherwise would not have been achieved at the expense of Plaintiff.

226.    Specifically, Jackson Walker was awarded $912,742 in fees, of which $192,257.50 were generated by Freeman, and $21,275.91 in expenses. Kirkland was awarded $23,448,619.50 in fees and $490,310.70 in expenses, in addition to taking a $12.5 million retainer pre-petition. Brown Rudnick was awarded $12,000,841.50 in fees and $468,989.48 in expenses.

227.    Had Defendants not engaged in the wrongful conduct, particularly had they revealed the existence of an intimate relationship between Jones and Freeman who was a partner at Jackson Walker, Defendants Kirkland, Jackson Walker, and Freeman would not have been appointed or would have been removed as counsel and would not have been entitled to compensation.

228.    In equity and fairness, Defendants Kirkland, Jackson Walker, and Freeman must return the fees they wrongfully collected through fraud and concealing the Jones-Freeman relationship. Jones should likewise be required to return any indirect pecuniary benefits he received through Freeman. And Brown Rudnick should be required to return fees that it recouped while failing to disclose the Jones-Freeman relationship.

**Respondeat Superior and/or Agency Liability**

229.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth here in full.

230. Kirkland, Jackson Walker, and Brown Rudnick are liable for the acts of their respective agents under the doctrine of respondent superior and/or under agency law and/or for the acts of its partners or employees.

231. In the alternative, Kirkland, Jackson Walker, and Brown Rudnick and/or their respective employees, agents and ostensible agents engaged in joint ventures, joint enterprises, are liable under the direct corporate liability theory, conspiracy, and/or are liable under the theory of respondeat superior.

## PRAYER FOR RELIEF

232. WHEREFORE, PREMISES CONSIDERED, Plaintiff prays for the following relief:

    a.    An order finding that RICO Defendants' actions, as set out above, violate RICO (18 U.S.C. § 1962(a); constitute obstruction of justice (18 U.S.C. §1503), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bankruptcy fraud (18 U.S.C. § 152), and honest services fraud (18 U.S.C. § 1346); and constitute a conspiracy to commit RICO violations (18 U.S.C. § 1962(d)).

    b.    An order finding Defendants breached their fiduciary duties and aided and abetted each other Defendant's breach of fiduciary duties,

    c.    An order finding the Fraud Defendants committed fraud,

    d.    An order finding the Conspiracy Defendants liable for civil conspiracy,

    e.    An order finding that all Defendants were unjustly enriched.

    f.    An order appointing Joe Sofio as Special Administrator or Special Litigating Trustee, or in the alternative, granting Plaintiff derivative standing to pursue claims against Defendants on behalf of all Chesapeake bondholders and/or

creditors; or in the further alternative, an order certifying a class of bondholder and/or creditor plaintiffs to pursue direct claims.

g.    A judgment against Defendants for monetary, actual, consequential, and compensatory damages caused by Defendants unlawful conduct.

h.    An order for the disgorgement of profits and forfeiture of fees obtained by Defendants through wrongful conduct;

i.    An order awarding Plaintiff statutory damages;

j.    An order awarding Plaintiff nominal damages;

k.    An order awarding Plaintiff costs and expenses of suit;

l.    An order awarding Plaintiff pre and post-judgment interest; and

m.    An order awarding such other and further relief to which Plaintiff may be entitled at law or in equity.

## DEMAND FOR JURY TRIAL

233.    Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

By:    */s/ Mikell A. West*
Mikell A. West
Texas State Bar No. 24070832
S.D. Tex. Bar No. 1563058
Robert W. Clore
Texas State Bar No. 24012436
S.D. Tex. Bar No. 2032287
BANDAS LAW FIRM, P.C.
555 Carancahua Street, Suite 1200
Corpus Christi, Texas 78401
Telephone: (361) 698-5200
Facsimile: (361) 698-5222
mwest@bandaslawfirm.com
rclore@bandaslawfirm.com